## Case No. 16,644.

### UNITED STATES v. WARR.

[3 N. Y. Leg. Obs. 346.]

District Court, S. D. New York. 1845.

EXTRADITION—TREATIES—EVIDENCE.

What evidence is necessary to justify the delivery up of a prisoner charged with having forged an acceptance in England, under the provisions of the treaty between the United States and Great Britain of the 9th of August, 1842, commonly called the Ashburton treaty [8 Stat. 572].

The prisoner [Henry Warr] was arrested under section 10 of the treaty between the United States and Great Britain concluded at Washington August 9, 1842. That section is in these words: "It is agreed that the United States and her Britannic majesty shall, upon mutual requisitions by them, or their ministers, officers, or authorities, respectively made, deliver up to justice, all persons who being charged with the crime of murder, of piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum, or shall be found within the territories of the other: provided, that this shall only be done upon such evidence of criminality, as according to the laws of the place where the fugitive, or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed; and the respective judges and other magistrates of the two governments shall have power, jurisdiction, and authority, upon complaint made under oath to issue a warrant for the apprehension of the fugitive or person so charged that he may be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing the evidence be denied sufficient to sustain the charge, it shall be the duty of the examining judge, or magistrate, to certify the same to the proper executive authority, that a warrant may issue for the surrender of such fugitive. The expense of such apprehension and delivery shall be borne and defrayed by the party who makes the requisition and receives the fugitive." The warrant by virtue of which the arrest took place had been issued by United States Commissioner Morton upon the affidavit of Samuel R. Champ that Henry Warr had fled secretly from Bridgeport, in the county of Dorset, England, where he was postmaster, and carried on a large business as master currier for a number of years, and copies of affidavits showing a probability that he had forged an acceptance of one Richard Kerslake for £28 10s., and produced the same to be cashed by Messrs. Eustace, Grundey & Co., bankers, at Bridgeport. In the latter part of May, the prisoner was brought before the commissioner, when Samuel R. Champ was sworn, and testified that he was attached to the Bridgeport police in Dorset, England, and had known the prisoner sixteen years; that he was post-

master and master currier at Bridgeport; that he there left secretly on April 14th or 15th last; that he had come to this country in the packet ship George Washington; that the witness came over in the Britannia steamer, which arrived here before the George Washington; that he knew the mayor of Bridgeport, Samuel Bennett, "and I was present, and saw the depositions of John Kerslake, John Hodder, and William Hounsall taken by him, and had heard those persons depose to what is stated in the copies of those depositions produced"; that he had compared these copies with the originals, which were made at the time the originals were taken; and he saw the mayor certify such copies under his seal, when they were immediately delivered to him, together with a warrant for Warr issued by Bennett, as justice of peace. Neither the day nor month when the originals were taken was stated in the jurat, and the copies were certified to be true under the hand and seal of "Samuel Bennett, Mayor."

The counsel for the Messrs. Grundey then offered in evidence the warrant issued by Bennett, and copies of the affidavits of Kerslake, Hodder, and Hounsall, alluded to in the testimony of Champ.

L. B. Shepard appeared on behalf of the prisoner, and urged the following objections to their being read in evidence:

(1) They are not verified by oath, and therefore cannot be received in evidence against the prisoner. First. The treaty requires such evidence of criminality as, according to the laws of the place when the fugitive or person charged shall be found, would justify his apprehension and commitment for trial if the offence had been there committed. Second. The prisoner is found in the United States, in the state of New York, and the constitution of the former and the bill of rights of the latter provide that no warrant "to seize the person" shall issue, but upon probable cause supported by oath or affirmation. Const. Amend. U. S. 1; Rev. St. (2d Ed.) p. 84, § 11.

(2) This provision is to be closely interpreted. And so it was held in Pennsylvania (Conner v. Com., 3 Bin. 38) that a warrant of arrest in a criminal case, issued upon common rumor and report of the party's guilt, though it recite that there is danger of his escape before witnesses could be summoned to enable the magistrate to issue it upon oath, was illegal and void on the face of it, and that an officer was not liable for refusing to execute it. And in Vermont, in State v. J. H., 1 Tyler, 444, it was held that a warrant to arrest a person charged with a crime upon the complaint of a private informer could not legally issue without the oath of the complainant. Both these decisions were made under constitutional provisions precisely like that contained in the constitution of the United States and the bill of rights of this state. These provisions can only be satisfied by the oath or affirmation of the complainant, taken before some

officer of the government that issues the warrant, because otherwise no indictment for perjury will lie against the complainant if his affidavit be wilfully false in the tribunals of such government, and in this case a person arrested would be deprived of his liberty by our laws while he was under their protection, through the act of one who was in no respect amenable to them. There may be some civil cases that seem to go on the converse of this rule, such as Turnbull v. Moreton, 1 Chit. 721, and Ellis v. Sinclair, 3 Younge & J. 273; but the distinction between those cases and this is that in the former the court before which the affidavit, taken in a foreign country, was used had control of the cause, and were to keep it for all the purposes of substantial justice, while these copies can only be used to divest this tribunal altogether of such control, and place one who is entitled to it beyond the protection of our laws. The originals were not taken before a proper officer. The laws of New York (the place where the prisoner is found) provide that, "in cases when by law the affidavit of any person residing in any foreign country is required, or may be received, in judicial proceedings in this state, to entitle the same to be read, it must be authenticated as follows: First. It must be certified by some judge of a court having a seal to have been subscribed and taken before him, specifying the time and place when taken. Second. The genuineness of the signature of such judge, the existence of the court, and the fact that such judge is a member thereof, must be certified by the clerk of the court under the seal thereof. 2 Rev. St. (2d Ed.) p. 307, § 33." No such authentication is made in this case. Therefore, the originals of these affidavits cannot be read, and, a fortiori, the copies could not. A mayor has not a right, by the mere virtue of that office, to administer oaths. Judicial notice cannot be taken by our courts that the mayor of Bridgeport is, ex officio, a justice of peace; and the presumption is the other way, for his office is the same as that of president of an incorporated village with us. See, also, 2 Rev. St. (2d Ed.) p. 213, § 50, as to who may administer oaths.

(3) The originals could not be read here. They do not set forth the day when they were sworn to in the jurat, and this is necessary. Doe v. Roe, 1 Chit. 228. See, also, Wood v. Stephens, 3 Moore, 236, and Anon., 1 Chit. 562n.

(4) The article of the treaty under consideration requires "complaint under oath" before the magistrate can issue warrant for the arrest. This clearly refers to an oath taken before the magistrate himself, for the words "under oath" only define the kind of complaint that is requisite. The power to issue a warrant upon the complaint, that implies that it shall contain matter enough for this purpose, under oath before the magistrate. It cannot be possible that the "evidence of criminality" contemplated by the treaty can be less than that required as a basis for the warrant.

(5) Duplicates of the original affidavits would have been better evidence than the certified copies produced.

L. R. Marsh and O. W. Sturtevant, for the British Government.

The warrant issued by Bennett as justice of peace shows his official character. Besides, it is certified upon that process. As justice of peace, he filed the original affidavits upon which the warrant was issued, and they are original records, that cannot be removed. A sworn copy of such a record is undoubtedly evidence, and that is what is offered here.

B. F. Butler, for the United States.

It never could have been in contemplation of the treaty-making power that the living witnesses should be brought into this country. The original affidavits are judicial proceedings that cannot be removed. Sworn copies are sufficient.

MORTON, Commissioner. A complaint under oath having been made before me that one Harry Warr, a British subject, had committed the crime of forging an acceptance to a bill of exchange in England, and had fled from justice, and was on his way, or was in New York, a warrant was granted for his apprehension, and thereupon he was brought before me, to the end that the evidence of his criminality might be heard and considered. Which having been done, the same is deemed sufficient to sustain the charge, and, according to the laws in force in the district and city of New York, the said evidence is judged sufficient to justify the aprehension and commitment of said Harry Warr for trial. Which is hereby certified to his excellency, the president of the United States, in pursuance of the 10th article of the treaty signed at Washington, the 9th day of August, 1842. The phraseology of the 10th article of the treaty in question, which bears directly upon the duty and power of the examining magistrate, is but a reiteration of the statute of New York conferring analogous power upon the state executive (1 Rev. St., 2d Ed., p. 149, pt. 1, c. 8, § 10), and was obviously intended to provide for a qualified and limited co-operation with the foreign government in placing fugitive criminals within the operation of the laws which they had violated, and from which they had fled, at the same time avoiding, while so doing, a compromise of the spirit of our institutions, and of the penal legislation of the United States and of the states; the substance of the provision being that if, under the evidence and circumstances, the accused person would be committed for trial if perpetrating the offence here, the same result shall, in effect, take place by handing him over to the authorities of the government whose laws have been violated. The inquiry, therefore, for the examining officer to make is whether the evidence, &c., would justify the commitment of the accused for trial here, if charged with its commission in New York. The offence of forging an acceptance to a bill of exchange, with which the prisoner is charged, would, under the statutes of New York, constitute the offence of forgery in the first degree, and be punishable by imprisonment in the state prison. 2 Rev. St. (2d Ed.) p. 561, pt. 4, art. 3, § 30.

The examination and commitment of persons charged with offences of this character is provided for by the laws of New York (2 Rev. St. p. 690, c. 11, §§ 12, 140), and would be complied with, to all intents and purposes, under the treaty for the commitment of a foreign fugitive for trial by the testimony of one competent and credible witness, or by the voluntary statement of the prisoner, and from which the magistrate should conclude that the offence had been committed, and probable cause to believe the prisoner to have been guilty thereof.

An officer who came out with a warrant to arrest the prisoner testifies that he had known the accused for fifteen years, and up to the time of his sudden disappearance from the place where the crime was committed; that witness saw the original of a bill, a true copy of which is produced, the existence of the original being voluntarily admitted by the prisoner, who is attended by counsel; that he knew the person who purports to have been the acceptor of the said bill, who declared, under examination on oath, in witness' presence, that the same was a forgery, and that the acceptance was not in his handwriting, or had he ever authorized any person to sign his name to the said acceptance; that witness knew the handwriting of the said prisoner, and believed, upon inspecting said bill, that the acceptance was a forgery; that the prisoner left, &c. very secretly; that a warrant for his arrest was granted by a magistrate uniting in himself the character of mayor and justice of the peace, and duly authorized to administer oaths; that, the original warrant being produced, the prisoner voluntarily states that the acceptance in question was not made by the party referred to, but he says it was written by a person having authority to sign the acceptor's name; that it was in his (the prisoner's) possession, and by him was presented, so accepted, &c. Under 2 Rev. St. p. 592, § 21, this would constitute evidence from which the conclusion may certainly be drawn: (1) That an offence had been committed; (2) that there is probable cause for believing that the prisoner is guilty. The existence of the bill, an acceptance forged, and the prisoner's connection therewith, appears in a shape as to evidence that would entitle it to be heard upon a trial.

Certified copies of various affidavits were also offered in corroboration of probable cause, but in my judgment these cannot be received as positive evidence under the laws of this place, nor could they in England, according to the rules of the common law. A statute of the United States, indicating this as a mode

for carrying out in detail the objects of the 10th article of the treaty, would render them fully inadmissible.