## Case No. 9,913.

### MULLER'S CASE.

[20 Leg. Int. 301; [1] 5 Phila. 289; 5 Leg. & Ins. Rep. 146.]

District Court, E. D. Pennsylvania. Sept. 14, 1863.

EXTRADITION—PUBLIC PROSECUTION—DEPOSITIONS TAKEN—CRIMES NAMED IN TREATY—DISCHARGE UNDER PREVIOUS APPLICATION.

1. The treaties between the United States and certain European states for the mutual extradition of fugitives charged with certain crimes, do not require that an application for extradition shall have been preceded in the country of the government making it, by a charge, or public accusation, of equivalent effect with an indictment. It suffices that there has, within the jurisdiction of the country making the application, been an authorized proceeding under which evidence has been, or might lawfully have been, taken there, with a view to a criminal prosecution, or to deciding whether to institute one.

2. Depositions preliminarily taken there with such a view should, if certified according to the act of 22d June, 1860 [12 Stat. 84], or otherwise duly attested, be admitted in evidence if they would be receivable in evidence there in support of a charge of a crime cognizable under such a treaty.

3. The crimes are named in the treaties with reference to known definitions in the system of general jurisprudence. But the specific applications of the definitions are determinable in particular cases, by the jurisprudence and legislation of the respective places of arrest.

4. In the United States, the jurisprudence and legislation must, under a charge of the forgery of a private writing, be those of the state of the Union in which the arrest is made.

5. The application for extradition may be sustained under a law of the state enacted after the date of the treaty, but in force at the time of the commission of the offence, and at the time of the hearing under the application.

6. A discharge of the accused party, under a previous application for extradition upon the same charge, heard in another state, does not preclude the renewal of the application, where the case does not appear to have been fully investigated and considered under the former proceeding.

[1] [Reprinted from 20 Leg. Int. 301, by permission.]

[This was a proceeding in the case of Traugott Muller, a forger and fugitive from justice.]

CADWALADER, District Judge. Of the treaties now in force on the subject of extradition, the earliest is that of 1842, with Great Britain. [8 Stat. 576.] Its form has, in general, been followed in the others. An occasional recurrence to it will prevent their phraseology from being applied with too much latitude. But an adherence to it so close as to exclude reasonable cosmopolitan interpretation of them should be not less avoided as too narrow.

In this case, at the hearing in July last, the proofs of identity showed that the person arrested was the party against whom the charge is made on behalf of the government of Saxony. There could be no doubt that he was the person who, under a former application made on the part of the same government, on the same grounds, before the judge of like jurisdiction for the Southern district of Ohio, had there been discharged from custody. Except the proofs of his identity, the evidence offered there and rejected, was the same as that which has been adduced and admitted. The jurisprudence and legislation of Ohio on the subject of forgery, were, for all the purposes of the case, the same, in effect, as the jurisprudence and legislation of Pennsylvania. The sufficiency, also, of evidence, to justify an apprehension and commitment for trial, would, in each state, as may be assumed, have been determinable by the same rules, if the offence had been charged as committed within her limits. I was, nevertheless, of opinion that the discharge in Ohio had not precluded a renewal here of the application. But this opinion was not founded upon any such literal interpretation of the treaty as would make its meaning dependent upon simple and rigid analogies to cases of commitment for trial by magistrates here and in England, on preliminary charges of crime, after previous refusals of magistrates to commit. I thought, on the contrary, and still think, that the personal status of an inhabitant of, or a sojourner in, the United States, might be too irrevocably involved in the result of a question of extradition to make so narrow a rule of decision sufficient for the exigencies of such a question. I therefore thought that there might be a case in which the previous rejection of such an application by such a judge would perhaps preclude its renewal—especially in the same judicial district or in another judicial district of the same state—but that this was not such a case.

The other questions were those of the sufficiency of the charge, and of the sufficiency of the proofs.

How, and how far, the crime in question must have been the subject of a charge or public accusation, in the country whose government asks the extradition, does not appear distinctly in the treaties, or in any opinion of

the supreme court of the United States. The subject has been discussed elsewhere, but not satisfactorily. Its difficulties are, in part, removed by the acts of congress of 1848 [9 Stat. 302] and 1860 [supra]. The argument that there must have been some authorized public accusation of equivalent effect with what is here, and in England, called an indictment, cannot prevail. To adopt such a rule, would interpolate in the treaties a condition requiring what might, in some countries, be considered objectionable as a partial prejudication of guilt in cases to be afterwards tried. The treaty with Great Britain certainly requires no previous indictment or presentment. Between the United States and that country, such a condition, if intended, would have been expressed. In Kaine's Case the only process had been a warrant issued in Ireland under an ex parte deposition. The warrant had not been executed, service of it having been successfully evaded. This warrant and a copy of the deposition, certified and attested under the second section of the act of 1848, appear to have been thought sufficient, together, to satisfy the requirements of the treaty. 14 How. [55 U. S.] 105, 108, 109, 115, 116. These requirements might, on either side of the Atlantic, be satisfied without even a warrant. Thus, in Pennsylvania, as in England, a constable or other officer may make an arrest for murder or robbery, on the spot, without a warrant, and may bring the party arrested at once before a magistrate, by whom depositions under the statutes of Philip and Mary may be taken forthwith. 6 Bin. 318; 8 Serg. & R. 49; Johnson v. Tompkins [Case No. 7,416]; 4 Coke, 40b; 9 Coke, 66a; Ld. Raym. 1297; Dougl. 358; 6 Barn. & C. 635; St. 1 & 2 Phil. & M. c. 13; and St. 2 & 3 Phil. & M. c. 10; 3 Bin. 621. The party thus arrested may, before any commitment, or any process against him, escape, and may afterwards be found on the other side of the Atlantic, within the jurisdiction of one of the contracting governments. Under the latter jurisdiction, the depositions, or duly attested copies, with proof that they were taken under such a summary proceeding, would sustain an application for extradition, if they sufficiently proved the commission of the offence. Copies of such depositions taken in England would, if certified under the act of congress of 1860, be receivable in evidence here, under this act, if not independently of it. So far as concerns mere accusation in the country whose government makes the application, any proceeding in that country under which evidence has been, or might lawfully be taken there, with a view either to a future criminal prosecution, or to deciding whether to institute one, satisfies the requirements of the treaty. Under the act of 1860, depositions preliminarily taken with such a view should be admitted in evidence here, if they would be receivable in evidence there. In this case, the proceedings in Saxony, through the verification of the Saxon authorities, attested by the consul general of the United States at Leipsig, were duly authenticated; and it sufficiently appeared that before the Saxon tribunals having cognizance of the question whether this party should be apprehended and committed for trial, the depositions of which copies were certified would have been receivable in evidence.

The remaining question was whether these depositions would, within the meaning of the treaty, have sufficed to justify his apprehension and commitment for trial under a charge of forgery, if the offence had been committed here. They fully sufficed to prove the act which was charged. Such an act, wherever punishable as a crime, is properly classed as a specific offence under the general head of "forgery." In the jurisprudence of Pennsylvania, at the date of the treaty with Saxony, this act would not have been punishable as a crime. But before its commission in Saxony, the Pennsylvania statute of March 31, 1860. § 169 [Laws, 1860, p. 423], had made such an act indictable and punishable as a misdemeanor. In the series of treaties which have been mentioned, certain offences, including forgery, are named with reference to their definitions in the system of general jurisprudence. But the treaties require the specific application of the definitions to be conformable, in particular cases, to the jurisprudence and legislation of the respective places where the parties may be arrested; and likewise require the application of local rules of decision as to the sufficiency of the evidence. The act in question—though generically forgery wherever criminal—might be specifically criminal in one place, but not in another. I thought that the question depended upon the law of Pennsylvania under the statute of 1860. and that the case, on the part of the Saxon government had, therefore been made.

There is no jurisprudence or common law of the government of the United States. See [U. S. v. Hudson] 7 Cranch [11 U. S.] 32; [U. S. v. Coolidge] 1 Wheat. [14 U. S.] 415; [Wheaton v. Peters] 8 Pet. [33 U. S.] 658; [Kendall v. Stoker] 3 How. [44 U. S.] 104. No legislation of their government, independently of the jurisprudence and legislation of the several states, can have been expected by those who made the treaties ever to give specific definition of certain crimes mentioned in them. No such legislation as to forgery or private writings, which is the offence here charged, can have been expected. As to crime, and others, local definitions and rules might be not less different in Ohio and Pennsylvania and in Scotland and in England, or might be more different. In framing the treaty of 1842 with Great Britain, these local differences must have been mutually considered by the governments of the two contracting nations. I thought that the decision of the case could not be affected by the date of the Pennsylvania statute. It was

posterior to the treaty with Saxony, but anterior to the commission of the offence charged. Local specific definitions of an offence, which may be safely applied, are those in force, both when it was committed and at the time of hearing. If their application is not ex post facto, the question whether they were in force at the dates of the respective treaties cannot be material. Diplomatic arrangements whose effect may depend upon internal regulations of the contracting states are almost necessarily dependent more or less upon prospective legislation. Such regulations are almost always liable to change in the course of internal administration. They may also undergo modification in order to meet occcasional requirements of international comity, or of the conventional arrangements themselves. These requirements may be only honorary, and the legislation consequently optional. But the treaties require that such definitions and rules as are from time to time observable under the local jurisdiction of each contracting government shall be applied by it in favor of the other.

The questions which have been reviewed, whether difficult or not, were important; and upon one, if not more of them, differences of opinion were supposed to exist. At my request, the case has been reargued on all the points before the judge of the supreme court for the circuit and myself. The only question which has caused us any embarrassment is that of the effect of the party's discharge in Ohio. Had that been a decision upon the legal merits of the case, pronounced after full investigation and consideration of them, our opinion might probably have been that a renewal of the Saxon government's application should not be entertained. But the proceeding there, as far as we know, consisted in the mere summary rejection of the evidence offered, for what reason we are not informed. The same evidence, with the proofs of identity, has been, so far as appears, considered for the first time under the present application. The act of 1848 should be interpreted, and the regulations prescribed in it administered, with reference to the international character of the obligation of extradition. The conventional obligation is not fulfilled where an application for extradition is, in any mode or degree, slighted by one of the contracting governments, to which it has been properly addressed. This must be considered in a case like the present, where provisions of the treaty are executed through judicial organs of the latter government. We therefore think, that until a decision founded upon adequate, investigation and full consideration, the proceedings under successive applications for extradition are, in effect, if not in character, analogous to successive preliminary hearings before local committing magistrates under ordinary charges of crime. On all the other points of the case we are of the opinion which I entertained at the close of the former hearing.

The prisoner was accordingly remanded into custody, to await the order of the president.