WRIGHT *v.* HENKEL.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

No. 661. Argued April 28, 29, 1903.—Decided June 1, 1903.

1. The general principle of international law in cases of extradition is that the act on account of which extradition is demanded must be a crime in both countries.
2. As to the offence charged in the case, this applicable treaty embodies that principle in terms by requiring it to be "made criminal by the laws of both countries."
3. If the offence charged is criminal by the laws of the demanding country and by the laws of the State of the United States in which the alleged fugitive is found, it comes within the treaty and is extraditable.
4. Bail cannot ordinarily be granted in extradition cases, but it is not held that the Circuit Courts may not in any case, and whatever the special circumstances, extend that relief.

WHITAKER WRIGHT applied to the Circuit Court of the United States for the Southern District of New York for writs of *habeas corpus* and certiorari on March 20, 1903, by a petition which alleged :

(1.) That he was a citizen of the United States restrained of his liberty by the Marshal of the United States for the Southern District of New York, by virtue of a warrant dated March 16, 1903, issued by Thomas Alexander, "United States Commis-

sioner for the Southern District of New York, and commissioner duly authorized by the District Court of the United States for the Southern District of New York, and also commissioner appointed under the laws of the United States concerning the extradition of fugitives from the justice of a foreign government under a treaty or convention between this and any foreign government," which warrant was couched in these terms :

" Whereas, complaint has been made on oath under the treaty between the United States and Her Majesty, the late Queen of Great Britain and Ireland, concluded and signed at Washington, on the 9th day of August, 1842, and of the supplementary treaty between the same high contracting parties, signed July 12, 1889, before me, Thomas Alexander, one of the commissioners appointed by the District Court of the United States for the Southern District of New York, and also commissioner especially appointed to execute the acts of Congress, entitled ' An act for giving effect to certain treaty stipulations between this and foreign governments for the apprehension and delivery of certain offenders,' approved August 12, 1848, and of the several acts amendatory thereof, that one Whitaker Wright did heretofore, during the month of October, in the year 1899, and in the month of December, 1900, in the city of London, in that part of the United Kingdom of Great Britain and Ireland called England, and within the jurisdiction of his said Britannic Majesty, commit the crime of fraud as a director of a company, to wit, did heretofore in the month of October, in the year 1899, and in the month of December, 1900, at the city of London aforesaid, then being a director of a certain body corporate, to wit, the London and Globe Finance Corporation, unlawfully make, circulate and publish certain reports and statements of accounts of the said corporation, which were false ; the said Whitaker Wright then well knowing the said reports and statements to be false, with intent thereby to deceive and defraud the shareholders or members of the said corporation ; that the said Whitaker Wright is a fugitive from justice of the Kingdom of Great Britain and Ireland, and is now within the territory of the United States ; that the crime of which the said Whit-

aker Wright has so as aforesaid been guilty is an offence within the treaty between the United States and Great Britain."

(2.) That the warrant was issued on a complaint by His Britannic Majesty's consul general at the port of New York, as follows:

"First. That one Whitaker Wright did heretofore and in the month of December, 1900, in the city of London, in that part of the United Kingdom of Great Britain and Ireland called England, and within the jurisdiction of his said Britannic Majesty, commit the crime of fraud as a director of a company, to wit, did heretofore and in the month of October, in the year 1899, and in the month of December, 1900, at the city of London, aforesaid, then being a director of a certain body corporate, to wit, the London and Globe Finance Corporation, unlawfully make, circulate and publish certain reports and statements of accounts of the said corporation, which were false; the said Whitaker Wright, then well knowing the said reports and statements to be false, with intent thereby to deceive and defraud the shareholders or members of the said corporation.

"Second. That the said Whitaker Wright is a fugitive from the justice of the Kingdom of Great Britain and Ireland, and is now within the territory of the United States.

"Third. That the crime of which the said Whitaker Wright has so as aforesaid been guilty is an offence within the treaty between the United States and Great Britain.

"Fourth. That deponent's information and belief are based upon messages received by cable from his Majesty's Secretary of State for Foreign Affairs, one of said messages stating that a warrant had been issued in England for the apprehension of the said Whitaker Wright for the offence herein charged and directing deponent to apply for a provisional warrant, under the treaty for extradition, between the United States and Great Britain.

"That deponent has since the apprehension of the said Whitaker Wright yesterday, cabled to His Majesty's said foreign secretary for fuller details as to said crime, and an answer is directly expected, but that the said Whitaker Wright may be

detained, pending the arrival of such information, deponent asks for a provisional warrant herein."

(3.) "That the aforesaid complaint states no facts which create jurisdiction for the issuance of the aforesaid warrant and for the detention of your petitioner; that it does not state any facts which show that your petitioner has been guilty of any offence within the provisions of any extradition treaty between the United States of America and the United Kingdom of Great Britain and Ireland."

(4.) That he had duly objected to the continuance of any proceedings under the complaint and warrant on the ground that the commissioner had no jurisdiction, but his objections had been overruled, and the commissioner had adjourned the proceedings until March 30, 1903.

(5.) That on March 18, 1903, he presented to the commissioner an application to be admitted to bail pending the proceeding, and in support of the application filed with the commissioner the affidavit of his attending physician, which was to the effect that petitioner was suffering from bronchitis and a severe chill, which might develop into pneumonia, and that the confinement tended greatly to injure his health and to result in serious impairment; but that the commissioner denied the application on the ground that no power existed for admitting petitioner to bail; (6) that the cause of imprisonment was the charge and the refusal to admit to bail.

(7.) That the imprisonment and detention were illegal, and the warrant void, the complaint stating no jurisdictional facts to warrant imprisonment and detention. That the denial of the right to give bail constitutes a violation of the Eighth Amendment of the Constitution, and section 1015 of the Revised Statutes, and of the common law of the United States, and constitutes a deprivation of liberty without due process of law.

The writs prayed for were granted and after hearing dismissed and the application to be admitted to bail denied, March 30, the opinion being filed March 25, and copy of final order served March 28. The case was then brought to this court by appeal.

At the argument it was made to appear that on March 31 His Majesty's consul general at New York made a new complaint, which reiterated the original charge, with some amplification, and added that. Wright " did also, at the times and places aforesaid, then being a director and manager of said company or corporation aforesaid, with intent to defraud, alter and falsify books, papers and writings belonging to the said company or corporation and made and concurred in the making of false entries, and omitted and concurred in omitting material particulars in books of account and other documents belonging to the said company or corporation; and did also, at the times and places aforesaid, then being a director of the said company or corporation as aforesaid, alter and falsify books, papers and writings, and made and was privy to the making of false and fraudulent entries in the books of account and other documents belonging to the said company or corporation, with intent to defraud and deceive shareholders and creditors of said company or corporation, and other persons."

It was further stated : " That deponent's information and belief are based upon a certified copy of a warrant, issued by one of His Majesty's justices of the peace, for the city of London, for the apprehension of the said Whitaker Wright, for the offence herein first enumerated, and a certified copy of the information and complaint of the Senior Official Receiver in Companies Liquidation (acting under the order of the High Court of Justice) and the depositions of Arthur Russell and John Flower, in support thereof, upon the application for a summons against the said Whitaker Wright, and the depositions of George Jarman and Harry Gerald Abrahams on which information and complaint and depositions, the said warrant was granted for the apprehension of the said Whitaker Wright," etc. Copies of these papers accompanied the complaint, and reference was made to cable messages from the Secretary of State for Foreign Affairs.

On this complaint a warrant was issued and the accused arraigned before the commissioner, and it was thereupon stated that the demanding government would abandon all further proceedings under the complaint of March 16, and consented

to the discharge of the prisoner from the arrest thereon. The commissioner held that as the proceedings under the previous warrant had been carried into the Circuit Court, he was without power to discharge the prisoner under that warrant. Subsequently the order of the Circuit Court dismissing the writs of *habeas corpus* and certiorari and remanding the prisoner was brought to the commissioner's attention, but counsel for the prisoner stated that papers were being prepared for the purpose of removing the case to the Supreme Court. The commissioner ruled that pending such proceedings he must decline to dismiss the complaint and discharge the prisoner.

Article X of the treaty of 1842, 8 Stat. 572, 576, reads as follows :

"It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them, or their ministers, officers, or authorities, respectively made, deliver up to justice all persons who, being charged with the crime of murder, or assult with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum, or shall be found, within the territories of the other : *Provided* That this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed ; and the respective judges and other magistrates of the two governments shall have power, jurisdiction, and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered ; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper executive authority, that a warrant may issue for the surrender of such fugitive. The expense of such apprehension and delivery shall be borne and defrayed by the party who makes the requisition, and receives the fugitive."

Article I of the treaty of 1889, 26 Stat. 1508, is:

"The provisions of the said tenth article are hereby made applicable to the following additional crimes:

"1. Manslaughter, when voluntary.

"2. Counterfeiting or altering money; uttering or bringing into circulation counterfeit or altered money.

"3. Embezzlement; larceny; receiving any money, valuable security, or other property, knowing the same to have been embezzled, stolen, or fraudulently obtained.

"4. Fraud by a bailee, banker, agent, factor, trustee, or director or member or officer of any company, made criminal by the laws of both countries.

"5. Perjury, or subornation of perjury.

"6. Rape; abduction; child-stealing; kidnapping.

"7. Burglary; house-breaking or shop-breaking.

"8. Piracy by the law of nations.

"9. Revolt, or conspiracy to revolt by two or more persons on board a ship on the high seas, against the authority of the master; wrongfully sinking or destroying a vessel at sea, or attempting to do so; assaults on board a ship on the high seas, with intent to do grievous bodily harm.

"10. Crimes and offences against the laws of both countries for the suppression of slavery and slave trading.

"Extradition is also to take place for participation in any of the crimes mentioned in this convention or in the aforesaid tenth article, provided such participation be punishable by the laws of both countries."

Sections 83 and 84 of chapter 96, 24 and 25 Victoria, are as follows:

83. "Whosoever, being a director, manager, public officer, or member of any body corporate or public company, shall, with intent to defraud, destroy, alter, mutilate, or falsify any book, paper, writing, or valuable security belonging to the body corporate or public company, or make or concur in the making of any false entry, or omit or concur in omitting any material particular, in any book of account or other document, shall be guilty of a misdemeanor, and being convicted thereof shall be

liable, at the discretion of the court, to any of the punishments which the court may award as hereinbefore last mentioned."

84. "Whosoever, being a director, manager, or public officer of any body corporate or public company, shall make, circulate, or publish, or concur in making, circulating, or publishing, any written statement or account which he shall know to be false in any material particular, with intent to deceive or defraud any member, shareholder, or creditor of such body corporate or public company, or with intent to induce any person to become a shareholder or partner therein, or to entrust or advance any property to such body corporate or public company, or to enter into any security for the benefit thereof, shall be guilty of a misdemeanor, and being convicted thereof shall be liable, at the discretion of the court, to any of the punishments which the court may award as hereinbefore last mentioned."

Section 75 provided for a liability, on conviction of the misdemeanor therein mentioned, "at the discretion of the court, to be kept in penal servitude for any term not exceeding seven years and not less than three years, or to be imprisoned for any term not exceeding two years, with or without hard labor, and with or without solitary confinement."

Section 166 of the Companies' Act of 1862, 25 and 26 Vict. c. 89, provides :

"If any director, officer, or contributory of any company wound up under this act destroys, mutilates, alters, or falsifies any books, papers, writings, or securities, or makes or is privy to the making of any false or fraudulent entry in any register, book of account, or other document belonging to the company with intent to defraud or deceive any person, every person so offending shall be deemed to be guilty of a misdemeanor, and upon being convicted shall be liable to imprisonment for any term not exceeding two years, with or without hard labor."

Section 514 and subdivision 3 of section 611 of the New York Penal Code read as follows:

"SEC. 514. *Other cases of forgery in third degree.* A person who either, (1) being an officer or in the employment of a corporation, association, partnership or individuals falsifies, or unlawfully and corruptly alters, erases, obliterates or destroys

any accounts, books of accounts, records, or other writing, belonging to or appertaining to the business of the corporation, association or partnership or individuals; . . . is guilty of forgery in the third degree."

"SEC. 611. *Misconduct of officers and employés of corporations.* A director, officer, agent or employé of any corporation or joint stock association who: . . . (3) knowingly concurs in making or publishing any written report, exhibit or statement of its affairs or pecuniary condition, containing any material statement which is false; . . . is guilty of a misdemeanor."

Section 525 provides: "Forgery in the third degree is punishable by imprisonment for not more than five years."

By section 15 it is provided:

"A person convicted of a crime declared to be a misdemeanor, for which no other punishment is specially prescribed by this code, or by any other statutory provision in force at the time of the conviction and sentence, is punishable by imprisonment in a penitentiary, or county jail, for not more than one year, or by a fine of not more than five hundred dollars, or by both."

By the extradition act of Great Britain of 1870, 33 and 34 Vict. c. 52, it is provided that: "A fugitive criminal shall not be surrendered until the expiration of fifteen days from the date of his being committed to prison to await his surrender." The accused is, on committal, to be informed of this, and "that he has a right to apply for a writ of *habeas corpus.*" If he is not surrendered and conveyed out of the United Kingdom "within two months after such committal, or, if a writ of *habeas corpus* is issued, after the decision of the court upon the return to the writ, it shall be lawful for any judge of one of Her Majesty's Superior Courts at Westminster," on notice, to order him to be discharged, unless sufficient cause is shown to the contrary.

The first schedule contained a list of crimes, which includes: "Fraud by a bailee, banker, agent, factor, trustee, or director, or member, or public officer of any company made criminal by any act for the time being in force."

By section 5273 of the Revised Statutes, Title LXVI, Extradition, it is provided that whenever any person committed under the title or any treaty " to remain until delivered up in pursuance of a requisition," is not so delivered up and conveyed out of the United States within two calendar months after such commitment, he may be discharged by any judge of the United States or of any State, on notice, unless sufficient cause is shown to the contrary.

Section 5270 is as follows:

" Whenever there is a treaty or convention for extradition between the government of the United States and any foreign government, any justice of the Supreme Court, circuit judge, district judge, commissioner, authorized so to do by any of the courts of the United States, or judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within the limits of any State, district, or Territory, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention ; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.".

*Mr. Samuel Untermyer* and *Mr. Louis Marshall* for appellant.

I. The crime charged against the appellant is not one which is " made criminal by the laws of both countries," to wit, the United States and the United Kingdom of Great Britain and Ireland, and does not, therefore, come within the terms of the

extradition treaties between these governments. 1 Moore on Extradition, 21; *United States* v. *Rauscher,* 119 U. S. 407; *Terlinden* v. *Ames,* 184 U. S. 270; Art. X, Webster–Ashburton Treaty of 1842; Art. X, Supplemental Treaty of 1889. The language of the treaty cannot be enlarged by interpretation so as to include crimes which do not come within the limitation which the signatures of the treaty have expressly created. The whole subject of foreign intercourse is committed to the Federal government. *Tucker* v. *Alexandroff,* 183 U. S. 436; *Doe* v. *Braden,* 16 How. 657; *People ex rel. Barlow* v. *Curtis,* 50 N. Y. 321. As to definitions of the word country, see Webster's Dictionary; *Stairs* v. *Peaslee,* 18 How. 521; *United States* v. *The Recorder,* 1 Blatchf. 27; *S. C.,* 27 Fed. Cas. 718; Vattel, Bk. 1, c. 19, § 211.

As to meaning of phrase and English interpretation, see *Re Windsor,* 6 Best & Smith, 522; *Re Arton, No. 2,* 1896, L. R. Q. B. D. 509; *Re John C. Eno,* 10 Quebec L. R. 194; *Re Lamirand,* 10 Jur. 290; *Re Tully,* 20 Fed. Rep. 812, citing English cases. The language of the treaty is not " made criminal by *a law* of both countries" but "*by the laws* of both countries;" the case is not determined by saying that a statute of a State is a law of this country; it must be ascertained what is *the* law.

The right to extradite and the rules of evidence to establish the crime are not convertible propositions. *Re Farez,* 7 Blatchf. 345; *Re Wadge,* 15 Fed. Rep. 864; *Re Charleston,* 34 Fed. Rep. 531, cited and distinguished. Sec. 5209, U. S. Rev. Stat., applies only to national banks and cannot be considered as the counterpart of the English statute relating to frauds by directors of corporations; N. Y. Penal Code, § 611, is materially different from § 84 of the English Larceny Act. An examination of the statutes of every State and Territory shows that in a majority thereof there is no provision whatever defining criminal acts of directors of corporations and in most instances where such offences are defined the offence is materially different from that described in the English Larceny Act.

The contention of the British government is that if instead of landing in New York, the petitioner had landed in a State in which the act complained of is not made criminal he could

not be extradited but he can be because he landed in New York.

II. The court below in the exercise of its inherent power had the power and jurisdiction to admit the appellant to bail. Bail was denied on the ground that there was no power to admit to bail one arrested under the extradition act.

Neither the treaty nor the Revised Statutes contain prohibitions against admitting to bail. If the petitioner had been arrested here for a heinous crime (not capital), if he had been arrested in England for this crime, if he were a fugitive from the United States and had been arrested for an extraditable offence, if he had been arrested in interstate rendition proceedings, he could have been admitted to bail. It is the policy of this government to admit to bail any person arrested in any kind of proceeding except for contempt and for capital offences. Eighth Amendment U. S. Const.; Art. I, § 5, Const. New York; § 1015, U. S. Rev. Stat. As to power of United States commissioners to admit to bail, see *United States* v. *Hom Hing*, 48 Fed. Rep. 638, and see also *United States* v. *Hamilton*, 3 Dallas, 17; *Ex parte Virginia*, 100 U. S. 343; *Hudson* v. *Parker*, 156 U. S. 277; *Benson* v. *McMahon*, 127 U. S. 457, 462; *United States* v. *Volz*, 14 Blatchf.; 28 Fed. Cas. 384; *United States* v. *Rundlett*, 2 Curt. 41; 27 Fed. Cas. 915; *United States* v. *Dana*, 68 Fed. Rep. 886, and cases cited. The right to give bail has been recognized under the Chinese Exclusion Act in proceedings which are analogous to extradition proceedings. *Re Ah Kee*, 21 Fed. Rep. 701; *Re Chow Goo Pooi*, 25 Fed. Rep. 77; *In re Li Sing*, 180 U. S. 486; *United States* v. *Mrs. Gue Lim*, 176 U. S. 459; *United States* v. *Wong Kim Ark*, 169 U. S. 649, 652; *Chin Bak Kan* v. *United States*, 185 U. S. 213. The law of New York recognizes the right to give bail. Code Civil Procedure, §§ 550—592; Code Criminal Procedure, § 831. See also *State* v. *Hufford*, 23 Iowa, 579, and cases cited as to inherent powers of courts, *infra*.

The right to give bail in England is recognized. *Queen* v. *Spilsbury*, (1898) 2 Q. B. D. 615; *Ex parte Foster*, (1872) Consol. Digest of Quebec, *sub*. Extradition. The general proposition may be stated that any court or magistrate having power to

try a prisoner has jurisdiction to discharge him and *a fortiori* to admit him to bail. *People* v. *Goodwin*, 1 Wheeler's Criminal Cas. 434; *People* v. *McLeod*, 1 Hill, 377; 1 Burr's Trial (Robertson) 18–20 and 106; *People* v. *Van Horne* (murder), 8 Barb. 158; *State Treasurer* v. *Rolfe*, 15 Vermont, 9; *State* v. *Edney*, 4 Dev. & B. 378. As to power of English courts, *Rex* v. *Rudd*, Cowp. 331; *Rex* v. *Marks*, 3 East, 157; *Rex* v. *Baltimore*, 4 Burrows, 2179; 3 Hawk. Pl. Cr. 225; 4 Black. Com. 299; 1 Hale's Pl. Cr. 129; 4 Coke's Inst. 71; *Comb's Case*, 10 Mod. 334; Habeas Corpus Act, 31 Charles II; 2 Hale's Pl. Cr. 128; *Rex* v. *Judd*, 2 T. R. 255; *Linford* v. *Fitzroy*, 13 Jur. 303; *Ex parte Tayloe*, 5 Cow. 39. Other American authorities on inherent power of the court to take bail: *United States* v. *Evans*, 2 Fed. Rep. 152; Church on Habeas Corpus, 2d ed. § 390; 1 Bishop's New Cr. Proc. §§ 251, 1406, 1407; *Ex parte Robinson*, 19 Wall. 505; *United States* v. *Hudson*, 7 Cranch, 302; *Anderson* v. *Dunn*, 6 Wheat. 204, 227; *Ex parte Terry*, 128 U. S. 302; *Cartright's Case*, 114 Massachusetts, 230; *In re Neagle*, 39 Fed. Rep. 856; *Freeman* v. *Howe*, 24 How. 450; *Krippendorf* v. *Hyde*, 124 U. S. 131, 143. As to general inherent powers: *Bath County* v. *Amy*, 13 Wall. 244; *Labette County Commr.* v. *United States*, 112 U. S. 217; *Matter of Henderson*, 157 N. Y. 423. *In re Carrier*, 57 Fed. Rep. 578, distinguished; *Gorsline's Case*, 21 How. Pr. 85, cited and distinguished as overruled in *People* v. *Clews*, 77 N. Y. 39, and *Taylor* v. *Taintor*, 16 Wall. 371; *Re Vonder, The*, 85 Fed. Rep. 959, and see also *Cosgrove* v. *Winne*, 174 U. S. 64.

III. Assuming that the power to take bail exists there is every reason why the petitioner should be admitted to bail.

IV. The petitioner should be discharged or the court below instructed to admit him to bail.

*Mr. Charles Fox* for His Britannic Majesty's consul general at New York, appellee.

I. No examination having been commenced prior to the proceedings on *habeas corpus* now here for review, this court will confine its inquiry to the question of jurisdiction of the commissioner. *Terlinden* v. *Ames*, 184 U. S. 270, citing *Ornelas*

v. *Ruiz,* 161 U. S. 502; *Bryant* v. *United States,* 167 U. S. 104; *In re Shipp,* 12 Blatch. 501.

II. The commissioner had jurisdiction to issue the warrant upon the complaint made by the appellee. A complaint in an extradition case need not be as precise, technical and formal as an indictment. It is sufficient if it be clearly set forth and it appears that a treaty offence is charged. *Rice* v. *Ames,* 180 U. S. 371; *Re Roth,* 15 Fed. Rep. 507; *Re Farez,* 7 Blatch. 48; *Re Sterneman,* 77 Fed. Rep. 576; *Re Heinrich,* 5 Blatch. 414, 460; *Re Adutt,* 55 Fed. Rep. 376; *Re Grin,* 112 Fed. Rep. 790.

III. The complaint could be made on information and belief. Cases cited and *Re Kane,* 6 Fed. Rep. 34.

IV. The offence charged in the complaint is made criminal by the laws of both countries. §§ 83, 84, ch. 96, 24 & 25 Vict.; Companies Act of 1862, 25 & 26 Vict. ch. 89, § 166; § 5029 U. S. Rev. Stat.; Art. X, Treaty of 1842. That laws of New York are to govern, 4 Op. Atty. Genl. 330; *Re Farez,* 7 Blatch. 357; *Re Wadge,* 15 Fed. Rep. 865; *Re Clarkson,* 34 Fed. Rep. 533; and see as to evidence, *Grin* v. *Shine,* 187 U. S. 181. The treaty should be construed liberally. *Tucker* v. *Alexandroff,* 183 U. S. 424; *Grin* v. *Shine,* 187 U. S. 181. Under the laws of New York, where the appellant was found, the offence is a crime the same as in England. Penal Code, N. Y. § 611. See *Re Arton, No. 2,* 1896, 1 Q. B. D. 509. *Re Windsor,* distinguished. The same construction was applied to treaty between France and Great Britain. *Re Bellecontre,* 17 Cox C. C. 253; *Ex parte Piot,* 15 Cox C. C. 208.

V. The petitioner has no right of asylum in the United States. *Kerr* v. *Illinois,* 119 U. S. 436; *Grin* v. *Shine,* 187 U. S. 181.

VI. That the appellant is a citizen of the United States gives him no immunity to commit crimes in other countries, and does not prevent his surrender under a treaty of extradition, which makes no exception in favor of subjects of the surrendering country. *Neely* v. *Henkel,* 180 U. S. 123; Moore on Extradition, § 136; Executive Docs. U. S. No. 156, 1884.

VII. The appellant is not entitled to be discharged from

custody by reason of the insufficiency of the complaint before the court, a new complaint having been made remedying the defects in the first complaint. *Nishimura Ekiu* v. *United States*, 142 U. S. 651; *Iasigi* v. *Van De Carr*, 166 U. S. 392. The arrest on the second warrant was not illegal. *Re McDonnell*, 11 Blatch. 170.

VIII. The appellant is not entitled to be enlarged on bail, under any rule of law of the United States. *Queen* v. *Spilsbury*, 2 Q. B. D. 615, distinguished. The right to bail is negatived by implication. The laws of the United States never contemplated any provision whereby there should be a possibility of a miscarriage of the provisions of the treaty, and have carefully refrained from permitting a nullification of the treaty in a particular case by a release on bail and escape. Bail in interstate cases is taken in virtue of statutes. Where no statute exists it has been held bail could not be taken.

IX. It was not necessary that a warrant should have been issued or an indictment had before the commencement of these proceedings. *Grin* v. *Shine* and *Re Farez*, cited *supra*.

*Mr. Solicitor Genl. Hoyt*, with whom *Mr. Assistant Attorney Genl. Purdy* was on the brief, on behalf of the United States.

The appeal herein should be dismissed for the reason that all proceedings under the complaint of March 16, 1903, and the warrant of arrest issued thereon have been abandoned by the British Government.

If the laws of the State of New York, wherein the petitioner was arrested, make the act charged in the complaint criminal, which act is made criminal by the laws of Great Britain, the petitioner could be properly held for extradition under the extradition treaty between the United States and Great Britain, notwithstanding the fact that such acts as are charged in the complaint are not made criminal by the statutes of the United States. Moore on Extradition, secs. 337, 344; 4 Op. Atty. Gen. 330; *In re Muller*, 17 Fed. Cas. 975; *In re Farez*, 7 Blatchf. 345; *Grin* v. *Shine*, 187 U. S. 181; *Cohn* v. *Jones*, 100 Fed. Rep. 639; *In re Frank*, 107 Fed. Rep. 272; sec. 611, par. 3, Penal Code of New York; sec. 84, c. 96, 24 & 25 Vict.

The petitioner was not entitled to be enlarged on bail under

any law of the United States, for the reason that no provision is made in the law relating to extradition of criminals for admission to bail. *Queen* v. *Spilsbury,* 2 Q. B. D. 615; *In re Carrier,* 57 Fed. Rep. 578; Art. VIII, U. S. Const.; sec. 5, Art. I, New York Const.; secs. 5270, 1014, 1015, Rev. Stat.

That the offence must be one made criminal by the laws of both countries is a principle inherent in all extradition treaties. This is obvious because of the reciprocal nature of such engagements and the existence and similarity of crime in all places, whatever the differences as to definition and incidents of any particular crime. Phillimore, International Law, vol. I, p. 413. Treaties plainly imply the doctrine, but do not ordinarily express it. Such is the force of the phrase " mutual requisitions." Art. X, Webster-Ashburton Treaty. When different systems are to be adjusted, the treaty often contains a definiton. Treaties with France of 1843 and 1845, with Italy of 1868, with Belgium of 1882. Such cautions are necessary; international agreements are weighty matters; their precise meaning must be clear. But as confidence between nations has grown, the liberal view of extradition treaties as effectuating common and proper purposes emphasizes the broad, essential correspondences, and minor technical distinctions and mere designations have less weight. *Grin* v. *Shine,* 187 U. S. 181; *United States* v. *Bryant,* 167 U. S. 104.

The following ideas should guide and govern all extradition inquiries : that the charge has been deliberately and authoritatively made by a responsible and friendly civilized power; a strong presumption of verity and good faith attaches; the matter is of the highest comity and reciprocal concern; the accused person is the demanding government's offender, and under their charge it is to be presumed that he is seeking covert refuge in the country of arrest and is a fugitive from justice. The full rights of defence revive in the trial jurisdiction.

The United States and England denote with especial accuracy the scope of the various major offences. As statutory enactments in each country enlarge or qualify the contents of common law crimes, the new meaning is recognized, if not adopted, in the other country. Offences falling generally under

the head of fraud and breach of trust have only in recent times come within the reach of criminal law. They were formerly visited only with civil liabilities, and it is often still difficult to establish their criminal character.

No phrase was needed in the treaty of 1889 to explain the crimes of murder, burglary, etc., nor to express the necessity of criminality in both countries. They *are* criminal in both countries without that. The difference as to clause 4 of the treaty of 1889 with England respecting fraud by bailee is that as to that class of offences, not yet completely established as criminal, the two powers decline to engage respecting species still carrying a mere civil liability, and therefore the phrase "made *criminal* by the laws of both countries" was used. Provided the particular variety is *criminal* in both jurisdictions, exact correspondence is not necessary. The essence and substance are to be regarded, and highly technical considerations fall away.

The opinion in the *Windsor* case was rendered by eminent judges, but at that period the more liberal and cordial view of extradition had not much affected either governments or courts. The offence involved was not, apparently, a crime in England at all, and the decision was rather that the New York law was novel and exceptional in denominating false entry as forgery, than that the law was not a law of this country.

In the present case the commissioner's jurisdiction on the merits ought not to be withdrawn by the accused's writ of *habeas corpus* and appeal to this court at this stage. Other parts of the code of New York may be pertinent and ought to be examined and considered here or by the commissioner. When the object of the New York statute, its language, and the evil to be remedied are carefully considered, there can be no reasonable doubt that it is an exact analogue of the English law. Literal identity is not to be expected. Both statutes denominate the offence a misdemeanor; that the punishment is greater in England can make no difference.

The "laws of both countries" include the laws of all the component parts of each, and when the intention is otherwise there is an express reservation. Treaty of 1887 with the Netherlands.

It must be borne in mind in considering the elements of the authority to take bail that it is not a question of absolute *right* in a defendant, but of *power* and discretion in the courts. The Federal law as to bail is limited to crimes and offences against the United States. *Rice* v. *Ames*, 180 U. S. 371. Not only is there no affirmative authority for taking bail in extradition, but sec. 5270 directs commitment to jail, "there to remain," etc., when the evidence is deemed sufficient to sustain the charge. That a magistrate may finally discharge does not necessarily justify admission to bail in the interim. In the particular and peculiar subject of extradition a magistrate must look forward to possible surrender, and must guard his custody so that the contract may be performed. For an analogy see *Gorsline's Case*, 21 How. Pr. 85.

Mr. Chief Justice Fuller, after making the foregoing statement, delivered the opinion of the court.

The writ of *habeas corpus* cannot perform the office of a writ of error, but the court issuing the writ may inquire into the jurisdiction of the committing magistrate in extradition proceedings, *Ornelas* v. *Ruiz*, 161 U. S. 502; *Terlinden* v. *Ames*, 184 U. S. 270; and it was on the ground of want of jurisdiction that the writ was applied for in this instance before the commissioner had entered upon the examination; as also on the ground that petitioner should have been admitted to bail.

The contention is that the complaint and warrant did not charge an extraditable offence within the meaning of the extradition treaties between the United States and the United Kingdom of Great Britain and Ireland, because the offence was not criminal at common law, or by acts of Congress, or by the preponderance of the statutes of the States.

Treaties must receive a fair interpretation, according to the intention of the contracting parties, and so as to carry out their manifest purpose. The ordinary technicalities of criminal proceedings are applicable to proceedings in extradition only to a limited extent. *Grin* v. *Shine*, 187 U. S. 181; *Tucker* v. *Alexandroff*, 183 U. S. 424.

The general principle of international law is that in all cases of extradition the act done on account of which extradition is demanded must be considered a crime by both parties, and as to the offence charged in this case the treaty of 1889 embodies that principle in terms. The offence must be "made criminal by the laws of both countries."

We think it cannot be reasonably open to question that the offence under the British statute is also a crime under the third paragraph of section 611 of the Penal Code of New York, brought forward from section 603 of the Code of 1882. Fraud by a bailee, banker, agent, factor, trustee or director, or member or officer of any company, is made the basis of surrender by the treaty. The British statute punishes the making, circulating or publishing with intent to deceive or defraud, of false statements or accounts of a body corporate or public company, known to be false, by a director, manager or public officer thereof. The New York statute provides that if an officer or director of a corporation knowingly concurs in making or publishing any written report, exhibit or statement of its affairs or pecuniary condition, containing any material statement which is false, he is guilty of a misdemeanor. The two statutes are substantially analogous. The making of such a false statement knowingly, under the New York act, carries with it the inference of fraudulent intent, but even if this were not so, criminality under the British act would certainly be such under that of New York. Absolute identity is not required. The essential character of the transaction is the same, and made criminal by both statutes.

It may be remarked that the statutes of several other States agree with that of New York on this subject; and that sections 73 and 74 of the act of Congress to define and punish crimes in the District of Alaska, 30 Stat. 1253, c. 429, and section 5209 of the Revised Statutes, in respect of the officers of National Banks, are largely to the same effect as the English statute.

As the State of New York was the place where the accused was found and in legal effect the asylum to which he had fled, is the language of the treaty, "made criminal by the laws of

both countries," to be interpreted as limiting its scope to acts of Congress, and eliminating the operation of the laws of the States? That view would largely defeat the object of our extradition treaties by ignoring the fact that for nearly all crimes and misdemeanors the laws of the States, and not the enactments of Congress, must be looked to for the definition of the offence. There are no common law crimes of the United States, and, indeed, in most of the States the criminal law has been recast in statutes, the common law being resorted to in aid of definition. *Benson* v. *McMahon*, 127 U. S. 457.

In July, 1844, Attorney General Nelson advised the Secretary of State, then Mr. Calhoun, that "cases as they occur necessarily depend upon the laws of the several States in which the fugitive may be arrested or found;" and in December of that year, Mr. Calhoun wrote to the French mission: "What evidence is necessary to authorize an arrest and commitment depends upon the laws of the State or place where the criminal may be found." Moore on Extradition, § 344; *United States* v. *Warr*, 28 Fed. Cas. 411.

So Mr. Secretary Fish, in November, 1873, in replying to certain specified questions of the minister of the Netherlands, among other things, said: "That in every treaty of extradition the United States insists that it can be required to surrender a fugitive criminal only upon such evidence of criminality as, according to the laws of the place where he shall be found, would justify his apprehension and commitment for trial if the crime had there been committed;" and "that the criminal code of the United States applies only to offences defined by the general government, or committed within its exclusive jurisdiction, or upon the high seas, or some navigable water, and that each State establishes and regulates its own criminal procedure as well with respect to the definition of crimes, as to the mode of procedure against criminals, and the manner and extent of punishment." Moore on Extradition, § 337 n.

In *Muller's* case, 5 Phila. 289, 292, the definition of the offence in the State where the fugitive was found was applied by the District Court for the Eastern District of Pennsylvania, and Judge Cadwalader said:

" In the series of treaties which have been mentioned, certain offences, including forgery, are named with reference to their definitions in the system of general jurisprudence. But the treaties require the specific application of the definitions to be conformable, in particular cases, to the jurisprudence and legislation of the respective places where the parties may be arrested ; and likewise require the application of local rules of decision as to the sufficiency of the evidence. The act in question—though generically forgery wherever criminal—might be specifically criminal in one place, but not in another. I thought that the question depended upon the law of Pennsylvania under the statute of 1860, and that the case, on the part of the Saxon Government had, therefore, been made out.

" There is no jurisprudence or common law of the government of the United States. . . . No legislation of their government, independently of the jurisprudence and legislation of the several States, can have been expected by those who made the treaties ever to give specific definitions of certain crimes mentioned in them. No such legislation as to forgery of private writings, which is the offence here charged, can have been expected. As to this crime, and others, local definitions and rules might be not less different in Ohio and in Pennsylvania than in Scotland and in England, or might be more different. In framing the treaty of 1842 with Great Britain, these local differences must have been mutually considered by the governments of the two contracting nations."

And this language is strikingly applicable to the supplemental treaty of 1889, framed as it was by Mr. Secretary Blaine, and that accomplished lawyer and publicist, then Sir Julian Pauncefote, who was thoroughly familiar with the dual system of this government. Where there was reason to doubt whether the generic term embraced a particular variety, specific language was used. As for instance, as to the slave trade, though criminal, yet, apparently because there had been peculiar local aspects, the crime was required to be " against the laws of both countries ; " and so as to fraud and breach of trust, which had been brought within the grasp of criminal law in comparatively recent times. But it is enough if the particular variety was

criminal in both jurisdictions, and the laws of both countries included the laws of their component parts.

In *Grin* v. *Shine* we applied the definition of embezzlement given by the laws of California, but there the petitioner himself appealed to that definition, and the case, though in many respects of value here, did not rule the precise point before us.

But we rule it now, and concur with Judge Lacombe, that when by the law of Great Britain, and by the law of the State in which the fugitive is found, the fraudulent acts charged to have been committed are made criminal, the case comes fairly within the treaty, which otherwise would manifestly be inadequate to accomplish its purposes. And we cannot doubt that if the United States were seeking to have a person indicted for this same offence under the laws of New York extradited from Great Britain, the tribunals of Great Britain would not decline to find the offence charged to be within the treaty because the law violated was a statute of one of the States and not an act of Congress.

It is true that in the case of *Windsor*, 6 B. & S. 522, (1865,) a contrary view was expressed, but it should be observed that the charge was forgery, and it was held that the facts did not constitute forgery in England, and that the statute of New York defining the offence of forgery in the third degree could not properly be regarded as extending the force of the treaty to offences not embraced within the definition of forgery at the time when the treaty was executed. So far as the conclusion is expressed by the eminent judges who united in that decision, that the treaty did not comprise offences made such only by the legislation of particular States of the United States, it does not receive our assent.

The result is that we hold that the commissioner had jurisdiction, and that brings us to consider whether the commissioner or the Circuit Court erred in denying the application to be let to bail.

By section 1015 of the Revised Statutes it is provided: "Bail shall be admitted upon all arrests in criminal cases where the offence is not punishable by death; and in such cases it may be taken by any of the persons authorized by the preceding sec-

tion to arrest and imprison offenders." But this must be read with section 1014, the preceding section, and that is confined to crimes or offences against the United States. *Rice* v. *Ames*, 180 U. S. 371, 377. These sections were originally contained in one section. Judiciary Act of 1789, 1 Stat. p. 91, c. 20, § 33.

Not only is there no statute providing for admission to bail in cases of foreign extradition, but section 5270 of the Revised Statutes is inconsistent with its allowance after committal, for it is there provided that if he finds the evidence sufficient, the commissioner or judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

And section 5273 provides that when a person is committed "to remain until delivered up in pursuance of a requisition," and is not delivered up within two months, he may be discharged, if sufficient cause to the contrary is not shown.

The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment. And the same reasons which induced the language used in the statute would seem generally applicable to release pending examination.

The subject was considered by the District Court of Colorado in the case of *Carrier*, 57 Fed. Rep. 578, and Hallett, J., held that the matter of admitting to bail was not a question of practice; that it was dependent on statute; that although the statute of the United States in respect of procedure in extradition did not forbid bail in such cases, that was not enough, as the authority must be expressed; and that as there was no provision for bail in the act, bail could not be allowed.

And Judge Lacombe in the present case stated that applications to admit to bail in such cases had on several occasions

been made to the Circuit Court, and that they had been uniformly denied.

In *Queen* v. *Spilsbury*, 2 Q. B. Div. (1898) 615, it was held that the Queen's Bench had, " independently of statute, by the common law, jurisdiction to admit to bail," but that was a case arising under the Fugitive Offenders Act, and the distinction, existing ordinarily, between rendition between different parts of Her Majesty's dominions, and cases arising under the Extradition Acts, was pointed out. The court, while ruling that the power to admit to bail existed, held that as matter of judicial discretion it ought not to be exercised in that case.

We are unwilling to hold that the Circuit Courts possess no power in respect of admitting to bail other than as specifically vested by statute, or that, while bail should not ordinarily be granted in cases of foreign extradition; those courts may not in any case, and whatever the special circumstances, extend that relief. Nor are we called upon to do so as we are clearly of opinion, on this record, that no error was committed in refusing to admit to bail, and that, although the refusal was put on the ground of want of power, the final order ought not to be disturbed.

The affirmance of the final order leaves it open to the demanding government to withdraw the proceeding first initiated and proceed on the subsequent application, the pendency of which, as called to our attention, we do not think required us to dismiss this appeal.

*Order affirmed.*