**UNITED STATES of America,**

v.

**Rocco MESSINA and Charles J. Arico, a/k/a "Charles J. Pido".**

**No. 83 M 1004.**

United States District Court, E.D. New York.

June 24, 1983.

Raymond J. Dearie, U.S. Atty., Brooklyn, N.Y. (Reena Raggi and Mark Summers, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for plaintiff United States.

Kenneth A. Reiver, New York City, for defendant Messina.

Freeman, Nooter & Ginsberg, New York City (Louis M. Freeman and Lee A. Ginsberg, New York City, of counsel), for defendant Arico.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Rocco Messina and Charles Arico are in custody pending formal request for their extradition by the government of Italy. The United States has appealed from a magistrate's order admitting them to bail.

A complaint seeking the provisional arrest of Messina and Charles Arico was sworn out before Magistrate John Caden on May 27, 1983. The complaint stated that they had been charged in Italy with "attempted aggravated extortion and conspiracy to commit the same." Italian authorities were said to possess recordings of two threatening telephone calls made to an Enrico Cuccia, alleged to be one of the closest associates of Giorgio Ambrosoli who was shot dead in Italy on July 12, 1979. William Arico, the stepfather of Charles Arico, traveled to Italy with Rocco Messina in April 1979, three months before Ambrosoli's death. William Arico is said to have admitted to a witness that he was in Italy during this three month period committing contract murders for the well known Michele Sindona, and that Rocco Messina was smuggling guns into Italy from the United States for this purpose.

The voices on the two threatening telephone calls have been identified. A Deputy United States Marshal identified one caller as Charles Arico. A confidential source identified him as one caller and Messina as the other. The complaint stated that the Italian government had officially requested the provisional arrest of Messina and Charles Arico. Magistrate Caden issued the warrants.

Messina and Charles Arico were arrested on June 7, 1983. They appeared before Magistrate Caden, and he admitted each of them to bail of $250,000 cash or surety. On June 10, 1983, the United States applied to this court for an order continuing the detention without bail or, alternatively, staying the bail order until the magistrate could issue a written opinion. The court stayed the order and directed the parties to submit papers by June 14, 1983.

After briefs were submitted, the court requested papers by June 21, 1983, on four additional questions, as follows.

1. Has the government of Italy made a determination that this case is one of urgency? Has the State Department of the United States made such a determination?

2. Assuming that such a determination has been made by one or both of those authorities, is this court bound thereby or must it independently decide whether the requirement of urgency has been satisfied?

3. Assuming that this court must make an independent determination, is this a case of urgency?

4. Assuming that bail applications pending extradition hearings are generally governed by a "special circumstances" test derived from *Wright v. Henkel,* 190 U.S. 40, 63 [23 S.Ct. 781, 787, 47 L.Ed. 948] (1903), does the same test govern applications made after provisional arrest on the basis of urgency and prior to receipt of the formal request for extradition?

Shortly after the supplementary briefs were filed, the government informed the court by letter that it had received from Italian authorities "the documentary evidence necessary" to support a formal request for extradition, to be made within the week. The imminence of such a formal request does not moot the issue of bail. Moreover, until the request is made, Messina and Charles Arico are in custody solely on the basis of the provisional arrests.

■ In extradition proceedings the presumption is against bail because of the nation's foreign relations interest in successfully producing extradited persons. Accordingly, bail will be granted only under "special circumstances." *Wright v. Henkel,* 190 U.S. 40, 63, 23 S.Ct. 781, 787, 47 L.Ed. 948 (1903); *Hu Yau-Leung v. Soscia,* 649 F.2d 914, 920 (2d Cir.1981). This test applies not only after a finding of extraditability, but also after a request for extradition and prior to the hearing. *Wright v. Henkel, supra.* At least one circuit court has also applied the "special circumstances" standard after provisional arrest and before formal request, although the opinion does not discuss the import of the latter event. *United States v. Williams,* 611 F.2d 914 (1st Cir.1979), *rev'g* 480 F.Supp. 482 (D.Mass. 1979).

There has apparently been a less stringent standard in practice than in theory. *See* II M. Bassiouni, International Extradition chap. IX § 3 & nn. 7, 9 (collecting cases). One court surveyed "the more contemporary reported cases" and reported that "granting of bail pending completion of the extradition proceedings has been the rule rather than the exception." *Beaulieu v. Hartigan,* 430 F.Supp. 915, 916 & n. 2 (D.Mass.), *rev'd mem.,* 553 F.2d 92 (1st Cir. 1977).

The mere frequency with which bail has been granted, however, may not indicate any change in the test of *Wright v. Henkel.* It may be due to lack of strong opposition by the government in particular cases, perhaps after consultation with officials of the requesting governments.

There is some indication, however, that at least in the provisional arrest context, courts have liberalized the test for granting contested bail applications. The State Department is presumably familiar with the wide range of unreported cases in this field. In a diplomatic note of May 20, 1977, it wrote, "In general it is the practice of United States courts to allow persons provisionally arrested to remain at large on bond if there is no evidence that the person is about to flee." 1977 Digest of United States Practice in International Law 156.

On the other hand, a bill passed only by the Senate in 1978 would have precluded release after provisional arrest except on a showing of "unusual cause," while requiring only a showing of "good cause" when the detention is triggered by a formal request. S. 1437, 95th Cong., 2d Sess. § 3212(c) (1978). The State Department characterized the revised extradition provisions of that bill as, "for the most part, a codification of existing United States case law and practice." 1978 Digest of United States Practice in International Law 374. The Senate committee said that the bail provisions in particular were "not new but ... merely a codification of policies that have been followed by our courts for many years." S.Rep. No. 95–605 pt. I (1977).

Messina and Charles Arico assert special circumstances in that (1) they say they are good bail risks and (2) extraditability in this case is doubtful. The relevance of the first factor is supported by *In re Mitchell,* 171 F. 289 (S.D.N.Y.1909) (L. Hand, Jr.). The parties have presented no cases in support of the second. This is not a case in which lack of extraditability is evident from the face of the complaint. The closeness of the question may argue for bail if there are factual issues which require the participation of the detained person in order for counsel to prepare properly. *See In re Mitchell, supra.* But here the issues are legal ones involving the extraterritorial application of Italian penal law, the legality of a wiretap, and whether that legality matters.

The first question for this court is whether this is an appropriate one for provisional arrest at all.

The extradition treaty with Italy provides that a party may apply for provisional arrest "[i]n case of urgency." Treaty of Extradition, Jan. 18, 1973, United States-Italy, art. XIII, 26 U.S.T. 493, T.I.A.S. No. 8052. The article goes on to provide that the application shall contain a description of the person sought, an indication of intent to request extradition, a statement of the existence of an arrest warrant or judgment, and any further information that would be necessary to justify issuance of an arrest warrant had the offense been committed in the territory of the requested party. There is no explicit requirement that the application include information showing the case to be one of "urgency." Nonetheless, the Second Circuit Court of Appeals has expressed "reservations" as to a district judge's refusal to review an application for provisional arrest to see if urgency had been established. *Caltagirone v. Grant,* 629 F.2d 739, 744 n. 10 (2d Cir.1980).

It is clear that the rationale for provisional arrest is to prevent flight in advance of the formal request. Thus extradition treaties frequently provide for such arrest "[w]ith a view to preventing the escape of alleged fugitives from justice." IV G.

Hackworth, Digest of International Law § 326, at 103 (Dep't of State 1942). By 1968, "most extradition laws and treaties" permitted provisional arrest "to effect [an alleged fugitive's] arrest at once to prevent his further flight." 6 M. Whiteman, Digest of International Law § 25, at 920 (Dep't of State 1968). The Senate bill mentioned above allowed for "arrest without documentation, . . . the purpose of which is to cause the expeditious arrest of a fugitive who may flee before the requisite documentation is received. Such arrests are normally sought for fugitives who are passing through one nation to another in flight or in continuation of their criminal activities." S.Rep. No. 95–605 pt. I (1977).

It is less clear whether a determination of the appropriateness of provisional arrest may be reviewed other than for formal regularity of the application, and if so, by whom. These questions may turn on differences between the relevant treaty or statute provisions. For example it may be that "[g]enerally" the only requisite for a provisional arrest warrant is a statement that a warrant exists in the requesting country. 6 M. Whiteman, Digest of International Law 931 (Dep't of State 1968). But the context for that conclusion is the observation that United States extradition agreements "do not usually specify the information that must be specified by the requesting government to obtain provisional arrest and detention." *Id.* at 930.

Information as to the "urgency" of provisional arrests seems to have been included in applications as early as the nineteenth century. The State Department's "General circular" of 1892 relating to extradition applications made no mention of such information. But the 1890 "Circular as to Great Britain" did. Apparently out of concern for compliance with British law, the suggested application form recited that "there are reasonable grounds for supposing the accused may escape during the time necessary to present the diplomatic requisition for h__ surrender." Dep't of State, Memorandum Relative to the Extradition of Fugitives from the United States in British Jur-

isdiction, app. 2, May 1890, reprinted in IV J. Moore, A Digest of International Law § 606, at 359, 361 (1906).

In recent years it seems that at least as an administrative matter the requirement of submitting information showing urgency has become a fairly pervasive one. In late 1974 the State Department received an inquiry from the Australian Embassy as to the government's policy towards provisional arrest. The relevant portions of the extradition treaty with Australia are substantially identical to those at bar.

The State Department responded in a note dated January 9, 1975: "[T]o ensure against the possibility of the fugitive fleeing after having been released on bail, the policy is to arrest the fugitive only when the documentation has been received or when there is an urgent provisional arrest request, including information that the fugitive is likely to flee. In addition, the relatively short time period allowed by the treaty for providing the court with the documentation militates against making provisional arrest unless the documentation is prepared or unless there is urgency to do so." 1975 Digest of United States Practice in International Law 175–76. This policy was exemplified by the 1977 diplomatic note cited above. Because the State Department had "received no indication that [the] fugitives intend[ed] to leave the country," it declined to proceed on the request for provisional arrest. 1977 Digest of United States Practice in International Law 156.

A similar policy prevails with respect to requests originating in the United States. In July 1976 the Office of the Legal Adviser, Department of State, issued a memorandum on requests for extradition. It provided that the application of a state or territory for provisional arrest should, among other things, "describe the circumstances of urgency which led to the request for provisional arrest, e.g., the fugitive has a pattern of moving quickly and without warning." 1976 Digest of United States Practice in International Law 106, 109. A more formal limitation was found in the bill passed by the Senate and which the State Department

characterized as mostly "a codification of existing United States case law and practice," see supra. The proposed requirements for a complaint filed in support of provisional arrest included one that the complaint "describe the circumstances that necessitates such arrest." S. 1437, supra, at § 3212(b)(2).

The government contends that determinations of urgency are discretionary executive judgments which are so bound up with the foreign affairs power as to be nonjusticiable. Several considerations cast doubt on this contention. First, the courts scrutinize provisional arrest applications in other respects. See Caltagirone v. Grant, supra. Second, the requirement of urgency, although not stated in the list of matters that must be included in an application for provisional arrest, is found explicitly in Article XIII of the treaty. Third, the determination of whether risk of flight makes for urgency, like the determination of probable cause, is a matter within the institutional competence of the courts. Fourth, in the absence of judicial review, provisional arrest may become the rule rather than the exception, as contemplated by the treaty negotiations as well as past practice. See Caltagirone v. Grant, supra, 629 F.2d at 746 n. 18. And fifth, the broad authority of the executive in matters bearing on foreign affairs is not absolute when constitutional interests are implicated.

The eighth amendment apparently creates a right to bail in certain circumstances. United States ex rel. Goodman v. Kehl, 456 F.2d 863 (2d Cir.1972). See also Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1952); Hunt v. Roth, 648 F.2d 1148 (8th Cir.1981), vacated as moot, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). This is not to deny that classes of detained persons can be denied the right when there is reason to do so, see Carlson v. Landon, 342 U.S. 524, 544–46, 72 S.Ct. 525, 536–37, 96 L.Ed. 547 (1952). And clearly, foreign affairs concerns of the type noted in Wright v. Henkel can provide such reason. But the Carlson case involved a legislative commitment to the Attorney General of bail appli-

cations by aliens awaiting determination of deportability. There may be less constitutional latitude for prescriptions against bail that are executive and judicial in origin. *Cf. Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). The court does not suggest that the rule of *Wright v. Henkel* is constitutionally infirm, *but cf. Beaulieu v. Hartigan, supra,* 430 F.Supp. at 917; *United States v. Williams, supra,* 480 F.Supp. at 486–87. Nevertheless, the question of urgency goes to the question of whether there are "legitimate reasons" for detaining a person with a presumption against bail. *See United States ex rel. Goodman v. Kehl, supra,* 456 F.2d at 868. The court is counseled to construe extradition treaties so as to avoid constitutional doubt. *Caltagirone v. Grant, supra.* Even though the *Caltagirone* case itself lessens that doubt by requiring probable cause for provisional arrest, there may be an eighth amendment question when American citizens are held without bail in advance of a formal extradition request and without a showing of exigent circumstances.

However, in the light of the court's determination that Messina and Charles Arico should not in any event be admitted to bail, the court need not decide whether the question of "urgency" is justiciable.

■ In the present case the "Italian authorities have expressly communicated their determination" that the provisional arrests are matters of urgency, a determination in which the United States concurs. The government contends that the Italian determination, while not binding on the United States, is due deference as a matter of comity. The court agrees, and, in addition, accords considerable weight to the judgment of the United States, given its foreign affairs interest in the matter.

Taking appropriate account of the determinations of both governments and the facts presented to this court, urgency has been established. It is true that Messina and Charles Arico have ties to the community. But the government has described in an affidavit an "international scheme of violence and intimidation," including mur-

der, and has suggested that Messina has been and Charles Arico may be linked to it. Transcripts of the telephone calls are before the court and are patently threatening. They include such statements as "You're going to have to learn the hard way, I don't want you to have to get hurt, maybe even die" and "Remember your children.... They're going to get hurt."

On this record the court concludes that there is a substantial risk that Messina and Charles Arico would flee if released, that *Wright v. Henkel, supra,* applies in the case of a provisional arrest at least when urgency has been established, and that there are no "special circumstances" to justify granting bail.

Bail denied. So ordered.