In the Matter of the EXTRADITION OF
Yechiel HEILBRONN, Respondent.

No. 1:90:M:10.

United States District Court,
W.D. Michigan, S.D.

May 9, 1991.

See also 773 F.Supp. 1558.

Thomas J. Gezon, Acting U.S. Atty., and Donald A. Davis, Asst. U.S. Atty., Chief, Crim. Div., Grand Rapids, Mich., Drew C. Arena, Director, Office of Intern. Affairs, and Wendy H. Blank, Sr. Trial Atty., Office of Intern. Affairs, Dept. of Justice, Washington, D.C., for State of Israel (the U.S. Dept. of Justice).

Nathan Lewin and Douglas F. Curtis, Miller Cassidy Larroca & Lewin, Washington, D.C., David F. DuMouchel, Detroit, Mich., for respondent.

## ORDER DENYING BAIL

HUGH W. BRENNEMAN, Jr., United States Magistrate Judge.

Pending before the court is respondent's third request for bail. The first two requests were denied orally following hearings held in open court. The issue has been raised a third time as part of a responsive brief filed April 10, 1991, by respondent following the conclusion of the extradition hearing.

## BACKGROUND

This is a proceeding pursuant to 18 U.S.C. § 3184 to certify the extradition of Dr. Yechiel Dov Heilbronn, an Israeli national, to the State of Israel, under the provisions of the Convention on Extradition Between the Government of the United States of America ("the United States") and the Government of the State of Israel ("Israel"), which was signed at Washington, D.C. on December 10, 1962, and entered into force December 5, 1963 ("the Convention"). 14 UST 1707; TIAS 5476.

Dr. Heilbronn ("the respondent") was charged in a complaint filed in this district on January 30, 1991, with offenses in violation of the laws of Israel. Filed along with the complaint was a Request for Extradition from Israel. Based upon the complaint, an arrest warrant was issued for Dr. Heilbronn in this district on January 30, 1991, and the warrant was executed in

Petoskey, Michigan, in this district by the United States Marshal's office that evening. Petoskey is located approximately 185 miles north of Grand Rapids.

The complaint related that Dr. Heilbronn had been charged in Israel with having committed the offenses of bribery and fraud under aggravated circumstances, in violation of Sections 290 and 415 of the criminal code of that country, and that a warrant was issued for the arrest of the doctor on September 6, 1990, by a court in Tel Aviv, Yaffo.

The Extradition Request relates that respondent had previously been arrested in Israel on June 12, 1988, and was released on bail two days later. An indictment was filed in the spring of the following year. During the investigation and pending trial, respondent remained free on bail. Moreover, at his own request, respondent was allowed to leave Israel and come to the United States to attend medical seminars, but on the condition that he return in time for hearings. At the same time respondent's bail was increased 45,000 NIS (New Sheqels). Trial was set for November 28, 1989, but respondent failed to appear. A summons was issued and when respondent still did not appear, the September 6, 1990, arrest warrant was issued.

Following his arrest in this country, Dr. Heilbronn appeared with Grand Rapids counsel before the undersigned on January 31, 1991. All court proceedings have taken place in Grand Rapids, Michigan. The United States Attorney, acting on behalf of Israel, requested that respondent be held without bail. A bond hearing was scheduled for Monday, February 4, 1991, at the request of Dr. Heilbronn's local counsel, a date when the respondent's New York counsel could be present. Respondent also requested that the extradition hearing be postponed two weeks because the New York attorneys were scheduled to be in trial during that period. A decision on this request was held in abeyance pending the bail hearing.

A bond hearing was held on February 4, 1991. Dr. Heilbronn was represented by both local and New York counsel. One witness testified on behalf of respondent. At the conclusion of the hearing, bail was denied and Dr. Heilbronn was remanded to the custody of the U.S. Marshal pending the extradition hearing. The extradition hearing was delayed, with Dr. Heilbronn's concurrence, to February 19, 1991, to accommodate the schedule of Dr. Heilbronn's counsel.

In a telephone status conference held February 13, 1991, the extradition hearing was postponed to March 6, 1991, again at the request of the Dr. Heilbronn's New York attorneys and again with his informed consent.

At the time scheduled for the extradition hearing, Dr. Heilbronn appeared with new counsel from Detroit, who requested a further postponement to allow another new counsel from Washington, D.C. to prepare a defense for Dr. Heilbronn. The court was informed that Dr. Heilbronn had become dissatisfied with his New York attorneys. This continuance was granted and the extradition was scheduled for and held March 27, 1991.

Dr. Heilbronn appeared at the extradition hearing with his Detroit counsel and his two new attorneys from Washington, D.C. At the conclusion of the extradition hearing (which is the subject of a separate opinion), respondent resumed the witness stand and testified on the issue of bail. Two other defense witnesses also testified. Bail was again denied.

During the extradition hearing the United States moved to introduce into evidence additional affidavits in support of a supplemental memo it had filed with the court shortly before the hearing. This memo has submitted in response to a memorandum of law filed by the respondent in opposition to extradition on Friday, March 22, 1991. The supplemental affidavits were admitted into evidence over an objection for timeliness, and Dr. Heilbronn's lead counsel was granted a twelve day continuance over the Jewish passover to examine and file a response to the new material. An additional day was subsequently granted at respondent's request. Respondent's brief, which

once again raises the issue of bail, was filed on April 10, 1991.

A brief in opposition to bail was filed by the U.S. Attorney on April 16, 1991. A reply brief from the respondent was filed on April 22, 1991. A filing of some additional exhibits by respondent was made on May 7, 1991.

## RECONSIDERATION

At the February 4, 1991, bond hearing, the court announced it was applying the bail release standard announced in *Wright v. Henkel*, 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903). The Court essentially reiterated that position at the March 27, 1991 hearing.

In his April 10, 1991, brief, respondent takes exception to the court's adherence to that standard, and therefore the court has again reviewed its position. After a careful examination of the authorities cited and the arguments of counsel, the court remains of the belief that standard as announced by the Supreme Court in *Wright* remains the law today, and that as applied to the facts of this case, precludes the release of respondent.

## STANDARD OF RELEASE ON BAIL

■■■ There is no statutory right to bail in extradition cases. And unlike criminal cases in this country, the presumption rests against bail. *In re Extradition of Russell*, 805 F.2d 1215 (5th Cir.1986); *Beaulieu v. Hartigan*, 554 F.2d 1, 2 (1st Cir.1977). The controlling standard was set forth in *Wright v. Henkel, supra.*

In *Wright*, the Supreme Court held that bail should be granted in extradition cases only in "special circumstances." *U.S. v. Tang Yee–Chun*, 657 F.Supp. 1270, 1271 (S.D.N.Y.1987). The Court reached this conclusion only after rejecting the government's argument that extradition courts were without any power whatsoever to allow bail in the absence of any statute to that effect.

The *Wright* Court first held that when the demanding government (Israel) has done all that the treaty and law require, it:

"is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment."

*Wright v. Henkel, supra,* at 62, 23 S.Ct. at 786. The Court then applied the same standard to prehearing release:

"And the same reasons which induced the language used in the statute would seem generally applicable to release pending examination."

*Id.* at 62, 23 S.Ct. at 786. The court then affirmed the denial of bail, but concluded that it was unwilling to hold that the lower courts "possess *no* power in respect of admitting to bail other than as specifically vested by statute, or that, while bail should not ordinarily be granted in cases of foreign extradition, those courts may not *in any case*, and whatever the special circumstances, extend that relief." *Id.* at 63, 23 S.Ct. at 787. (Emphasis added). Thus, the court protected the inherent power of the courts to allow bail in extraordinary, or special, circumstances.

Significantly, the Supreme Court has never seen fit to alter this standard in the 88 years since it was crafted.

## RESPONDENT'S AUTHORITY

Respondent argues that there is a liberal trend toward release on bail in international extradition, and that "the common practice" is release on bail. Respondent offers scant authority for this assertion.

Respondent begins by drawing the court's attention to a treatise by Professor Bassiouni, in which the professor makes the contention that contemporary decisions in the federal courts have expressed a more liberal view of the *Wright* test. In support of this proposition, the treatise quotes the district court in *Beaulieu v. Hartigan*, 430 F.Supp. 915, 961 (1977), as follows:

"granting bail pending the completion of the extradition proceedings has been the rule rather than the exception."

Unfortunately, the district court in that case was reversed on appeal, and in its reversal the First Circuit reiterated the "special circumstances" test found in *Wright*. *Beaulieu v. Hartigan*, 554 F.2d at 2, *vacating in pertinent part*, 430 F.Supp. 915 (D.Mass.1977). *In re Extradition of Russell, supra*, at 1217.

Respondent next cites another district court decision, *United States v. Messina*, 566 F.Supp. 740, 742 (E.D.N.Y.1983), in which the court observed, "There has apparently been a less stringent standard in practice than in theory."

This case is not persuasive for several reasons. First, the court was relying, in making the statement, on the *Beaulieu* case, *supra*, which had been reversed.

Second, having made the statement above, the *Messina* court in the very next paragraph undercuts the statement's significance by adding:

"The mere frequency with which bail has been granted, however, may not indicate any change in the test of *Wright v. Henkel*. It may be due to lack of strong opposition by the government in particular cases, perhaps after consultation with officials of the requesting governments." *Id.* at 742.

In the present case, of course, government has consulted with the requesting government and is strongly opposing bail.

Third, the *Messina* court concluded by applying the *Wright* "special circumstances" test and denying bail.

Respondent next cites a Department of State note of May 20, 1977, which states that it is the general practice of the courts "to allow persons *provisionally arrested* to remain at large on bond if there is no evidence that the person is about to flee." (Emphasis added).

Provisional arrests are by definition of a temporary nature. A provisional arrest can be sought by a telegraphic request stating that an arrest warrant has been issued in the requesting country. 18 U.S.C. § 3187. The amount of time a person may be detained on a provisional arrest is severely circumscribed.

The present case, of course, is not a provisional arrest situation, since a formal extradition request was presented by the State of Israel, along with a substantial amount of evidence offered in support of its claims. By their very nature, formal extradition requests must necessarily be given more deference than provisional arrests. While the possibilities of flight may be paramount in those cases in which provisional arrests have to be authorized, and these possibilities might arguably have to be balanced against the tenuous basis for detaining these prisoners in the first place, the latter issue generally does not present as much of a problem after the presentation of a formal request. Accordingly, the provisional arrest situation does not necessarily provide an appropriate standard for analyzing the issue of bail where there has been a formal request.

Respondent's final authority for the general proposition that bail is the "common practice" in these situations, is a student law review Note. The Note adds little. The first three authorities it cites are the three listed immediately above.

The Note also cites the decision in *U.S. v. Leitner*, 784 F.2d 159, 160 (2nd Cir.1986), a Second Circuit decision upholding the denial of bail to a United States citizen who had jumped bail in Israel. (Prior to bail being denied in that case, a magistrate had granted bail on the same grounds that respondent raises here: that the appellant "posed almost no risk of flight," lack of a prior record, external pressures to flee Israel, and the fact he had not tried to hide once he was back in the United States.) This case does not endorse the so-called liberal trend, but merely observes that "some courts have noted a trend toward liberalization in bail, at least in the provisional arrest context," *Id.* at 160, again citing the same authorities discussed above.

Thus, the court's attention is repeatedly directed to an overruled 1977 district court decision and its progeny as the primary authorities for respondent's proposition.

Respondent also lists some specific cases in which individuals arrested on international extradition warrants have been released by American courts, pending resolution of the extradition requests. The foremost of these is *Demjanjuk v. Petrovsky*, 776 F.2d 571, 575–76 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). The accused in that case, "Ivan the Terrible," had been accused of murdering thousands of people at the Treblinka concentration camp.

Respondent initially represented to this court that Demjanjuk was immediately released on a $60,000 bond and remained free in this country until he was surrendered to Israel after three years. Respondent now concedes, however, after receiving the government's latest brief, that bail for Demjanjuk was in fact revoked midway through the proceedings. *See In the Matter of Extradition of Demjanjuk*, 612 F.Supp. 544, 571 (N.D.Ohio 1985).

Respondent has also provided the court with a newspaper story about eight mafia drug traffickers wanted by Italy who were arrested in this country. According to the newspaper, "many" of these defendants were released on bail in amounts of $700,-000 to $3.5 million. While it is difficult to see a parallel in this case where no such amount of bail has ever been suggested by respondent, the same article also offers as an unspoken rationale for bail in those cases the fact that under Italian law a person may be detained up to six years before being formally charged, that 20,000 Italians were in preventive custody awaiting trial, and that there were two million unfinished trial proceedings in Italy at that time.

Respondent also cites to the court five cases of accused "robbers, thieves and embezzlers" who were released on bail by magistrates.[1]

These cases differ markedly from the present case, however, since *none* of these defendants had previously jumped bond in the requesting country.

There are several other significant differences, as well. Respondent states, for example, that in *Barrett v. United States*, 590 F.2d 624 (6th Cir.1978), the accused "was released 15 days after his arrest on $50,000 bond" by the magistrate. This is an incomplete statement of the case, at best. In actuality, the chronology in the opinion only indicates that the magistrate "set" a $50,000 bond, not that the accused was "released." *Id.* at 625. (Even the "setting" of a bond is not necessarily significant in this instance. It is no secret that prior to the Bail Reform Act it was not unusual for bonds in some districts to be purposefully set high to prevent a dangerous defendant's release).

More importantly in the *Barrett* case, and not mentioned by respondent in his brief, is the fact that on January 11, 1978, four months after bond was set, the magistrate issued an order of commitment. It is beyond question that from that point until the Sixth Circuit upheld the proceedings on December 21, 1978, Barrett remained in custody. Since Barrett spent the majority if not all his time in custody, this case is not the "striking" one respondent imagines.

*Hu Yau–Leung v. Soscia*, 649 F.2d 914 (2nd Cir.), *cert. denied*, 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981), another of the cases where there had been no previous incident of bail jumping, is equally unavailing for respondent. Although Hu was released on bail in that case, the standard the court used to make that determination was the "special circumstances" test of *Wright*, which the government urges the court to follow in the present case, *Id.* at 920, not the more liberal standard respondent argues for. (The special circumstances in that case were that Hu was a juvenile, and there was a lack of any suitable facility in

---

1. *Hu Yau–Leung v. Soscia*, 649 F.2d 914 (2nd Cir.), *cert. denied*, 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981); *Theron v. United States Marshal*, 832 F.2d 492 (9th Cir.), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988); *Jiminez v. Aristiguieta*, 311 F.2d 547 (5th Cir.), *motion denied*, *Marcos Perez Jimenez v. Aristiguieta*, 314 F.2d 649 (5th Cir.) *cert. denied*, 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963); *Barrett v. United States*, 590 F.2d 624 (6th Cir.1978); *United States v. Taitz*, 130 F.R.D. 442 (S.D.Cal.1990).

which he could be held. *Id.* at 920.) The court's application of the *Wright* standard under these circumstances supports the government's position, rather than the contrary.

In two of the remaining three cases, *Theron* and *Jiminez*, it appears that the issue of bail was never even contested by the government. *See United States v. Messina, supra,* at 742. In the last of the five cases, *Taitz*, the court gave a more liberal reading to the term "special circumstances," but refused to even consider the question of special circumstances unless it could find that no risk of flight existed. Again, in none of these cases had the defendant previously jumped bond.

## DISCUSSION

The court has also considered the several arguments of an equitable nature raised by respondent, and has concluded that none of them, taken separately or collectively, amount to the special circumstances contemplated by the Supreme Court in *Wright*.

First, respondent's counsel argues that respondent is not a flight risk since he could only practice his calling in either the United States or Israel.

There are ready answers to this argument. One, respondent need not limit himself to only those places where he can practice medicine. Two, even if he chose only a place that would allow him to practice, there are undoubtedly places on this earth which would welcome a man with his talents and which might not look too closely at the fact that he was a fugitive from Israel, or which might not have applicable extradition treaties. The evidence suggests that in addition to Hebrew and English, respondent probably speaks some other languages as well, bearing in mind that he took his medical degree in Switzerland,

where neither Hebrew or English is one of the four official languages.

Second, respondent's counsel argues that this is not "a case in which the accused fled from a foreign jurisdiction in violation of terms of bail." (Respondent's Supplemental Memorandum, April 9, 1991, at 10).

This is a rather amazing assertion since, of course, this is precisely what respondent did do. The fact that the limits of his bond were extended to include United States territory does not alter the fact, as respondent freely admitted on the witness stand, that a week before trial he decided of his own volition that he was not going to honor the conditions of his bond that required him to return for trial. Trans. of April 25, 1991 Hearing at 185–186.

Third, respondent suggests that the delays to-date, during which he has been incarcerated, must somehow be attributed to Israel. Yet respondent has had an attorney in Israel at all times. Respondent has known not only his trial date, but that he was going to be extradited. Armed with this knowledge and knowledge of the charges against him, respondent had over a year to prepare an extradition defense. Indeed, he testified he retained New York counsel in the Spring of 1990. Thus, he could well have been prepared to have an extradition hearing immediately following his arrest, as was the government and the court, instead of requesting several delays.

■ Fourth, respondent argues that his release would benefit the public. While this is true, if he were allowed to continue to practice,[2] the mere fact that a respondent is a doctor—even a highly trained one—cannot be a "special circumstance" within the meaning of *Wright*, unless we are prepared to say that the normal rules of extradition are not going to apply to doctors by virtue of who they are. The

---

2. Dr. Heilbronn testified that he accepted permanent employment with the Burns Clinic in Petoskey on April 1, 1991. This was after he had jumped bond and knew that Israel would attempt to extradite him. (3/27/91 Hrg. Tr. 186). Dr. Heilbronn never informed the clinic of either the indictment in Israel or the impending extradition. *Id.* at 177.

The Burns Clinic has stated that whether respondent could be re-employed depended upon the conditions of his release. In a letter to the court dated April 8, 1991, the Clinic stated that "[i]f he is released but could be recalled on a moment's notice, it would be unethical ..." to return patients to his care who might be thus jeopardized.

Also, the Clinic said it could not say whether Northern Michigan Hospitals would "reinstate privileges."

**1582**

court is not aware of any authority for carving out such an exception.

## CONCLUSION

For the reasons discussed above, I am of the opinion that the test set as forth by the Supreme Court in *Wright* is the controlling standard that must be applied in this case. I do not find this standard to have been meaningfully modified by either the Supreme Court or the Sixth Circuit.

Nor do I find any persuasive trend away from this test in cases where a person has previously jumped bail in the requesting country, and the United States, on behalf of the requesting country, has actively opposed release in the American court. Even Professor Bassiouni, relied upon by respondent, states "the trend toward liberality that seemed to develop in the 1970's has been reversed in the 1980's." Bassiouni, INTERNATIONAL EXTRADITION, 1987, at 539.

■ Moreover, Prof. Bassiouni also observes that "denial of bail for the reason that the relator is flight-prone remains a valid and viable justification." *Id.* at 538. Thus, even if I were to accept the liberal approach to extradition bail argued for by Respondent, it would not avail him anything. Where a defendant knowingly and intelligently chooses to put himself above the law by jumping bail (in this instance because of his subjective determination that he could not get a fair trial), he is customarily not afforded a second chance to violate the trust of the court.

No special circumstances within the meaning of *Wright* have been demonstrated. On the other hand, the fact that respondent wilfully disregarded his Israel court obligations when he determined in his own mind that it was in his best interest to do so, establishes that he is flight-prone. Therefore, even the supposed "liberal" standard has not been met.

Respondent's renewed motion for bail is denied.

IT IS SO ORDERED.