**UNITED STATES of America, Plaintiff,**

v.

**James Joseph SMYTH, Defendant.**

**No. CR 92–0152 BAC.**

United States District Court, N.D. California.

July 24, 1992.

974

Mark N. Zanides, Asst. U.S. Atty., San Francisco, Cal., for plaintiff.

Karen Snell, Asst. Federal Public Defender, San Francisco, Cal., for defendant.

ORDER

CAULFIELD, District Judge.

On April 30, 1992, the United States Attorney filed a Complaint seeking a warrant for the provisional arrest of JAMES JOSEPH SMYTH for extradition to the United Kingdom of Great Britain. 18 U.S.C. § 3184. On May 27, 1992, the U.S. Attorney filed an Indictment in this District charging Smyth with making a false statement in a passport application in violation of 18 U.S.C. § 1542.

On June 3, 1992, Smyth was arrested on the passport charge in San Francisco, California and taken into custody. The U.S. Attorney withheld execution of the provisional arrest warrant issued on April 30. Smyth was arraigned on June 9, 1992. At the arraignment, Magistrate Judge Claudia Wilken heard arguments on defendant's request to be released on bail pending trial on the passport charge. Magistrate Judge Wilken ordered that Smyth be detained pending trial on the passport charge. During the hearing, the government called to the attention of the magistrate judge both the false passport charge and the request for extradition by the United Kingdom.

■ On July 14, 1992, this court reversed the magistrate judge's order denying Smyth's request to be released pending trial. As Smyth was being held on the passport charge, and not the provisional arrest warrant, the court held that he was entitled to the presumption supporting bail contained in the Bail Reform Act of 1984. 18 U.S.C. § 3142(c). Under the Bail Reform Act, the government bears the burden of persuasion to show by a preponderance of the evidence that the defendant is a flight risk or, by clear and convincing evidence, that he is a danger to the community. *United States v. Aitken,* 898 F.2d 104, 107 (9th Cir.1990). The government made no attempt to argue that Smyth posed a threat to the community. With respect to the government's argument that Smyth was a flight risk, the court was persuaded by the recommendations contained in the Pre–Trial Services Report that with the proper bond and security procedures, Smyth posed no flight risk. The court also

found that Smyth's ties to the community and support were substantial. The court ordered a bond of $1.5 million dollars, with security measures including electronic monitoring. The court also ordered that those individuals who have signed personal bonds with the court were to report any violation of the court's bond requirements.

On July 15, 1992, one day after the court's ruling granting Smyth's request for bail, the government executed the provisional arrest warrant and requested that he be detained pending extradition to Great Britain. Thereafter, Smyth filed the current Motion for Bail which, after discussion with the parties, the court set for hearing on July 23, 1992 at 4:00 p.m.

Smyth was born in Belfast, Northern Ireland in 1954. In 1977 he was living with his parents in the Ardoyne section of Northern Ireland when he was arrested for the attempted murder of a prison guard. Smyth was tried and convicted by a single judge in the Diplock Court of attempted murder and sentenced to twenty years in the Maze prison in Belfast, Ireland.

In September of 1983, 38 prisoners, including Smyth, escaped from the Maze. In 1984, he arrived in San Francisco. Since that time Smyth has lived and worked in San Francisco without any reported incident. It is undisputed by defendant that he has lived here under an assumed name, and that he obtained passports using false names. In 1986, Smyth married Margaret Lynch. Smyth maintains that he has never shared with his wife the specifics of his life in Ireland.

## DISCUSSION

### I. BAIL

■ Smyth brings this motion seeking release on bail pending his extradition hearing. It is well settled that bail should be denied in extradition proceedings absent a showing of "special circumstances". *See Wright v. Henkel*, 190 U.S. 40, 62–63, 23 S.Ct. 781, 786–87, 47 L.Ed. 948 (1903); *Hu Yau–Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir.1981), *cert. denied*, 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389; *Salerno v.*

*United States*, 878 F.2d 317 (9th Cir.1989). There is no presumption favoring bail in the extradition context; in fact, the opposite is clearly the case. *Matter of Extradition of Russell*, 805 F.2d 1215, 1216 (5th Cir.1986). Recently, however, courts have noted that the State Department has recognized a trend towards liberalization of bail determinations, at least in the provisional arrest context. The practice of the district courts has been to release persons provisionally arrested awaiting the filing of formal extradition charges. *See United States v. Leitner*, 784 F.2d 159, 160 (2d Cir.1986); *United States v. Messina*, 566 F.Supp. 740, 742 (E.D.N.Y.1983); *United States v. Tang Yee–Chun*, 657 F.Supp. 1270, 1271 n. 2 (S.D.N.Y.1987); *United States v. Taitz*, 130 F.R.D. 442, 446 (S.D.Cal.1990).

■ Smyth contends that the following "special circumstances" justify granting bail pending his extradition hearing: (1) his background, including the political climate in Northern Ireland; (2) his extensive community ties; (3) his case against extradition is strong and he has a need to consult with counsel; (4) the proceedings are likely to be lengthy; (5) the prospect that his health will deteriorate while in prison; and (6) since he does not present a flight risk, there is no diplomatic necessity for his detention.

What precisely constitutes "special circumstances" has never been defined. In *Wright*, the Supreme Court upheld the lower court's order denying bail. In so doing, the court expressed its unwillingness to hold that courts do not possess any power to grant bail in extradition matters. *Id.* at 63. In the eighty-nine years since *Wright* the Supreme Court has not revisited this issue.

In *Salerno v. United States, supra*, the Ninth Circuit held that the raising of substantial claims upon which defendant has a high probability of success, a serious deterioration of health while incarcerated, and unusual delay in the appeal process all constitute "special circumstances". In *Hu Yau–Leung v. Soscia*, 649 F.2d at 914, the Second Circuit considered defendant's age

and background, along with the unavailability of any suitable facility in which to house the minor defendant. In *In re Mitchell*, 171 F. 289 (D.C.N.Y.1909), Judge Learned Hand considered defendant's need to consult with counsel about pending civil litigation concerning his entire fortune. And in *United States v. Taitz*, 130 F.R.D. 442 (S.D.Cal.1990), the "special circumstances" included, among other things, the complexities of the charges pending against defendant, medical complications experienced during his prehearing incarceration, and the lack of facilities available to enable him to practice his religion, Orthodox Judaism. *Id* at 445–446.

The list of potential "special circumstances" is not limited to those previously enumerated in published decisions. Moreover, the decision to grant bail and, consequently, the determination of what constitutes a "special circumstance", is left to the sound discretion of the trial judge. *Beaulieu v. Hartigan*, 554 F.2d 1 (1st Cir. 1977). The only certain guideline is that lack of flight risk *alone* does not constitute sufficient "special circumstances". *See Salerno v. United States*, 878 F.2d at 318; *Matter of Extradition of Russell*, 805 F.2d 1215, 1217 (5th Cir.1986).

The court follows the analysis employed in *Taitz* which held that, under *Salerno*, the court must first determine whether there is a risk of flight. If there is no risk of flight, the court must then determine whether "special circumstances" exist which support granting release on bail. 130 F.R.D. at 445.

### A. *Risk of Flight*

This court has already determined during the passport bail hearing that Smyth does not pose a risk of flight. The court disagrees with the government's assertion that the extradition matter creates a risk of flight beyond that which was presented in the passport case. While the two matters employ different standards for determining Smyth's entitlement to bail, the government made it clear in their argument opposing bail in the passport matter that the extradition warrant, even though not executed at the time, would operate as an inducement to Smyth to flee. The court was persuaded by Smyth's substantial and compelling community ties and support in the community that he would not flee from the jurisdiction. Since that time, numerous friends and relatives have come forward to place their major assets—their homes—as security for Smyth's release. The court is still persuaded that Smyth will not betray that community trust, and that he poses no risk of flight. Smyth is married to a U.S. citizen. He voluntarily and, in his own behalf, stated at the hearing that he intends to stay in this country and pursue his rights under the United States Constitution.

### B. *"Special Circumstances"*

Smyth has stated that he intends to challenge extradition under Article 3(a) of the United States–United Kingdom Supplemental Extradition Treaty. Article 3(a) provides:

> Notwithstanding any other provision of this Supplemental Treaty, extradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try to punish him on account of his race, religion, nationality, or political opinions, or that he would, if surrendered, be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions.

Smyth has stated that he intends to challenge both his underlying conviction for attempted murder, and the escape charge under Article 3(a). Neither the government nor Smyth has cited to any authority interpreting Article 3(a) since it has been enacted, effective December 23, 1986. This is a case of first impression. The United States Senate added section 3(a) to the extradition treaty with the United Kingdom when the political prisoner exception was removed. The section creates a new avenue for the defendant to challenge extradition where race, religion, nationality or po-

litical opinion form the basis of the request for extradition or where the defendant "would be prejudiced ... at his trial by reason of his race, religion, nationality or political opinions."

The defense presented by Smyth requires much greater than ordinary investigation, analysis and development of facts. The defense, as outlined by Smyth, requires an intensive investigation of the underlying facts supporting his original conviction for attempted murder, as well as the facts in support of his claims regarding the conditions of his confinement in the Maze. Defense counsel has argued that Smyth's personal assistance is critical in securing the necessary witnesses or documents in preparation for asserting this defense.

The government correctly argues that every defendant has a need to consult with counsel, and that the desire to consult with counsel does not ordinarily constitute a "special circumstance". However, the court views the defense asserted by Smyth as being particularly fact intensive. In contrast, cases in which courts have rejected this argument have involved primarily legal questions which did not require the extensive participation of the defendant. *See Messina,* 566 F.Supp. at 743.

Smyth was convicted after a judge trial in the Diplock court in December 1978. The defense argues that a review of the trial judge's order demonstrates substantial questions about whether his conviction meets the minimal standards of due process within a democratic context. The evidence against Smyth was largely circumstantial. Moreover, Smyth has raised questions regarding his treatment while incarcerated in the Maze. While it is unclear how Article 3(a) is to be applied—for example, whether it is the obligation of this court to review the findings of the Diplock court [1]—it is, nonetheless, clear that Smyth has recourse to assert the treaty provision as a defense to extradition. It is well settled that illegal aliens have rights of proce-

dural due process. *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976); *Doherty v. Thornburgh,* 943 F.2d 204, 209 (2nd Cir.1991), *cert. dismissed,* — U.S. —, 112 S.Ct. 1254, 117 L.Ed.2d 485 (1992). Accordingly, Smyth must be given every opportunity to aid his counsel in the difficult task of amassing evidence, from another part of the world, regarding events which occurred between eight and fifteen years ago. It is highly unlikely that Smyth's counsel will be able to locate key witnesses or evidence without his extensive aid.

If Smyth's claims are to be taken seriously, and surely they must, given the legislative history behind the supplemental treaty between the United States and the United Kingdom, the need to consult freely and openly with counsel, and communicate with individuals in Ireland who may be called upon as witnesses, or at the very least aid in gathering information, is as great a "special circumstance" as the need to protect one's fortune (*In re Mitchell,* 171 F. 289); or the need to be free from irritating prison soaps and foods (*U.S. v. Taitz,* 130 F.R.D. 442).

## II. URGENCY

Smyth argues that the government has failed to show an urgent need for the warrant for provisional arrest as required by Article VIII(1) of the Extradition Treaty. The government contends that the question of urgency constitutes a nonjusticiable political question. The government also argues that the court should give great deference to the urgency determination made by the countries involved. As the court has held that "special circumstances" do exist which warrant granting bail, the urgency question raised by Smyth need not be decided.

## CONCLUSION

On this record, the court concludes that Smyth has presented significant evidence in support of his claim that he does not

---

**1.** The Congressional intent regarding the district courts' review of the procedural safeguards maintained in the foreign courts is subject to debate. *See* 132 CONG.REC. § 9167 et seq. (senators' comments regarding the Supplemen-

tal Treaty). Smyth is nonetheless entitled to develop his defense in anticipation of whatever this court ultimately determines to be the level of review available under Article 3.

present a flight risk. Moreover, the court is persuaded that special circumstances exist which mandate that Smyth be released to enable him to aid in preparing his defense to the extradition matter. The court is mindful of the government's need to ensure compliance with its treaty and present Smyth for extradition should it prevail during the extradition proceedings. However, the court is convinced that Smyth poses no risk of flight. Moreover, to hinder Smyth from fully aiding in his defense to the extradition proceedings would render Article 3(a) meaningless.

Finally, it should be remembered that Smyth has been provisionally arrested. Britain has not yet instituted formal extradition proceedings. In light of the court's finding that Smyth poses no risk of flight, and that "special circumstances" exist which will require his extensive personal aid in preparing his own defense to the extradition proceedings, there does not appear to be any diplomatic necessity to warrant his continued detention at this stage of the proceedings. *Taitz*, 130 F.R.D. at 446. Accordingly, GOOD CAUSE APPEARING, it is hereby ORDERED that Smyth be released on bail pursuant to the provisions established during the bail proceeding on the passport charge.

IT IS SO ORDERED.